JUSTICE MORRIS
delivered the Opinion of the Court.
¶1 Eleanor M. Prosser (Prosser), Richard H. White (White), and *211 Lorraine Crotty (Crotty) (collectively Neighbors) appeal from the order of the Twenty-First Judicial District, Ravalli County, granting summary judgment to the City of Hamilton (City).
¶2 We review the following issues on appeal:
¶3 Do Hamilton City Ordinances § 17.116.010 and § 17.116.050 impose a “special duty” on the City to protect residents in the vicinity of a proposed building modification ?
¶4 Does a condition that the City places on a building modification permit impose a “special duty” on the City when it is deciding whether to enforce that condition?
FACTUAL AND PROCEDURAL HISTORY
¶5 Vicki Kennedy, on behalf of Kennedy Enterprises, Inc. (collectively Kennedy) purchased property in Hamilton at 1013 South First Street on March 1, 2000. The property originally had been constructed as a Kentucky Fried Chicken restaurant and was zoned for commercial uses. The property bordered residentially zoned property to the west, unzoned property to the south and east, and commercially zoned property to the north. The Neighbors all resided, at some time during this litigation, on the residentially zoned property immediately to the west of Kennedy’s property.
¶6 Kennedy submitted Precise Plan of Design No. 2015 (the Plan) in April 2000 to the City. Kennedy proposed to modify the property for the commercial uses of a casino and lounge. The Hamilton City Zoning Board of Adjustment (Board) held a hearing regarding the Plan on April 25, 2000. White and Crotty attended. White raised concerns regarding the Plan, including car headlights shining into his windows. The Board considered White’s comments, as well as other public comments, incorporated some of the comments into the Plan, and then adopted the Plan through Office of Community Development Resolution 20-14 (the Resolution). The Board included in the Resolution a condition stating that “[t]he developer shall comply with all federal, state and local laws,” (the Condition). The City subsequently issued Kennedy a temporary certificate of occupancy for the casino on January 1, 2001, followed by a permanent certificate of occupancy on April 30, 2002.
¶7 Neighbors allege that Kennedy’s casino became an unbearable nuisance immediately after it opened for business. Neighbors complained of loud music, loud patrons, revving car engines, fights, loud garbage dumping, and drug use, occurring on the Kennedy property at all hours of the night. Neighbors contend that these *212 disturbances unreasonably interfered with the use and enjoyment of their property. Neighbors claim that they complained about Kennedy’s casino to various City officials, including the City Council, the Police Chief, and the Mayor. Neighbors allege, however, that they received no satisfactory resolution to their complaints.
¶8 Neighbors filed this lawsuit against the City and Kennedy in district court on March 6, 2003. Neighbors brought tort claims for compensatory damages against the City, alleging, among other things, that the Board had violated City ordinances when it approved the Plan, that various City officials had failed to take legal action against Kennedy, and that various City officials had failed to abate a nuisance at Kennedy’s casino. Neighbors also sought compensatory and punitive damages against Kennedy for intentionally or recklessly maintaining a nuisance, and asked the court to enjoin Kennedy from creating or continuing the nuisance.
¶9 The City filed a motion for summary judgment on May 30, 2003, with regard to all of Neighbors’ claims against the City. The District Court held a hearing on August 13, 2003, and granted summary judgment on September 27,2005, in favor of the City on all claims. The City filed an unopposed motion asking the court to certify the summary judgment order as final pursuant to M. R. Civ. P. 54(b). The District Court granted the motion and entered final judgment on October 27, 2005. The Neighbors timely appealed.
STANDARD OF REVIEW
¶10 We review de novo a district court’s decision to grant summary judgment, using the same criteria applied by the district court under M. R. Civ. P. 56. GRB Farm v. Christman Ranch, Inc., 2005 MT 59, ¶ 7, 326 Mont. 236, ¶ 7, 108 P.3d 507, ¶ 7. Summary judgment is appropriate when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” M. R. Civ. P. 56(c). We draw all reasonable inferences in favor of the party opposing summary judgment. Watkins Trust v. Lacosta, 2004 MT 144, ¶ 16, 321 Mont. 432, ¶ 16, 92 P.3d 620, ¶ 16.
DISCUSSION
¶11 We address on appeal only those claims raised by Neighbors. Neighbors’ separate action against Kennedy for compensatory and punitive damages, as well as injunctive relief, remains pending in *213 District Court. Nothing in our analysis here affects the validity of Neighbors’ claims against Kennedy. Neighbors finally will be allowed to pursue these claims once we have resolved their appeal against the City.
¶12 Neighbors argue on appeal that the City breached two “special duties.” Neighbors first claim that the City, acting through the Board, breached a “special duty” to protect the Neighbors when it passed the Plan in violation of Hamilton City Ordinances. Neighbors also claim that the City, acting through various City officials, breached a “special duty” owed to Neighbors when it refused to abate the alleged nuisance. The District Court determined pursuant to the public duty doctrine that neither the City, nor its officials, owed any “special duty’ to Neighbors when passing the Plan or when deciding whether to take actions to abate the alleged nuisance. Neighbors admit the validity of the public duty doctrine, but argue that they fall within the “special relationship” exception to that doctrine. The Neighbors assert no other basis for imposing a duty on the City on appeal other than through the “special relationship” exception to the public duty doctrine.
¶13 The Dissent labels the Court’s characterization of Neighbors’ position on appeal as “patently untrue.” Second Dissent, ¶ 70. In truth, however, a review of the Neighbors’ briefs reveals that they raise four issues for review. In truth, nowhere in any of the four issues raised do the Neighbors challenge the validity of the public duty doctrine. Neighbors instead assert repeatedly that the District Court erred in not agreeing with their claims that a “special relationship” existed between the City and Neighbors. The Court normally confines its review to the issues actually presented on appeal. Regardless of what Neighbors may have argued in the District Court, we must confine our review to the issues actually raised by Neighbors on appeal. See e.g. In re P.D.L., 2004 MT 346, ¶ 14, 324 Mont. 327, ¶ 14, 102 P.3d 1225, ¶ 14. The Dissent nevertheless launches into an entirely gratuitous analysis of the public duty doctrine with respect to sovereign immunity. Second Dissent, ¶¶ 72-75. Neighbors abandoned this argument on appeal and we need not address it. See e.g. Skinner v. Allstate Ins. Co., 2005 MT 323, ¶ 9, 329 Mont. 511, ¶ 9, 127 P.3d 359, ¶ 9.
¶14 In a similar vein, the Dissent, entirely on its own accord, attempts to convert Neighbors’ tort claims against the City into an action for inverse condemnation. Second Dissent, ¶¶ 76-97. We normally decline to engage in this type of back-seat lawyering and decline to do so now. See e.g. Elliot v. Montana Dept. of Revenue, 2006 MT 267, ¶ 15, 334 Mont. 195, ¶ 15,146 P.3d 741, ¶ 15. The Dissent insists that Neighbors *214 alleged and pursued an inverse condemnation action. The Dissent contends in part that the City’s approval of the Plan caused the Neighbors’ property to depreciate in value. Second Dissent, ¶¶ 92-97.
¶15 Dissent’s argument founders on several factors. First, appellant Prosser purchased her property in December of 2001, more than a year after the City had adopted the Resolution on April 25, 2000. “[I]t is a general rule of the law of eminent domain that any award goes to the owner at the time of the taking, and that the right to compensation is not passed to a subsequent purchaser.” Palazzolo v. Rhode Island, 533 U.S. 606, 628, 121 S. Ct. 2448, 2463 (2001). This Court specifically has stated that a party cannot complain regarding alleged diminution in value caused by a government action when she purchased the property after the government action. Knight v. City of Billings, 197 Mont. 165, 176, 642 P.2d 141, 147 (1982); see also Johns v. Black Hills Power, Inc., 722 N.W.2d 554, 558 (S.D. 2006) (applying subsequent purchaser doctrine).
¶16 The second defect arises from the fact that appellants White and Crotty do not own their residence. They rent. Neighbors’ complaint alleges damage to the value of their property or their real property, but it fails to specify whether White and Crotty are leaseholders in the property or merely tenants at will. White’s and Crotty’s landlord is not a party to this action. As a general rule, a court will award a single amount for each property taken by the government pursuant to an inverse condemnation and a lessee is barred as a matter of law from bringing an inverse condemnation action against the condemning authority for a separate valuation of and award for his leasehold interest. A lessee's remedy lies in instituting an action against the lessor. Direct Mail Services, Inc. v. Best, 729 F.2d 672, 676 (10th Cir. 1984).
¶17 Moreover, a split of authority exits regarding whether a tenant at will can recover damages in an inverse condemnation action. See Nichols on Eminent Domain vol. 2, § 5.02[6][i] (3d ed., Matthew Bender 2003) (“Tenants holding occupancy under conditions less secure than a lease or month to month tenancy generally have no interest to recover compensation for the taking of property.”); 29A C. J.S. Eminent Domain § 151 (2007) (“[T]he fact that the lease can be terminated on short notice must be considered in determining the value of the tenant’s interest.”); 26 Am. Jur. 2d Eminent Domain § 232 (2001) (“[A] mere tenant at will ... is generally not entitled to compensation for the taking of his or her interest...”). These factors further militate against the need to pursue unnecessarily the inverse *215 condemnation analysis undertaken by the Dissent.
¶18 The public duty doctrine provides that where a municipality owes a duty to the general public, that duty is not owed to any particular individual. Nelson v. Driscoll, 1999 MT 193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21. The public duty doctrine derives from the practical conclusion that a municipality would be mired hopelessly in civil lawsuits if it were held responsible for every infraction of the law. Nelson, ¶ 21. The public duty doctrine prevents individual members of the public from using tort liability to constrain unduly a municipality’s discretion to use its limited resources to promote the general welfare. Nelson, ¶ 21.
¶19 We have recognized, however, an exception to the public duty doctrine. A person maybe able to establish that the municipality owes that person a “special duty” that arises out of a “special relationship” between the person and the municipality. Nelson, ¶ 22. A person demonstrates a “special relationship” by establishing that (1) a particular statute was intended to protect a specific class of persons, of which plaintiff is a member, from a particular type of harm; (2) a government agent undertook specific action to protect the plaintiff or the plaintiffs property; (3) the plaintiff was reasonably induced to rely on government action; or (4) under certain circumstances, a third party in custody of the government caused harm to the plaintiff. Nelson, ¶ 22. We have held that where the facts are undisputed the question of whether a “special relationship” exists is a question of law. Nelson, ¶ 19.
ISSUE ONE
¶20 Do Hamilton City Ordinances § 17.116.010 and § 17.116.050 impose a “special duty” on the City to protect residents in the vicinity of a proposed building modification?
¶21 Neighbors argue first that Hamilton City Ordinances § 17.116.010 and § 17.116.050 imposed a “special duty” on the City when it approved the Plan:
Section 17.116.010 Intent. Precise plan of design is established to provide for orderly development of property to insure compatibility to the surrounding existing and planned land uses.
Section 17.116.050 Rejection or Approval. If the proposed precise plan of design would substantially depreciate property values in the vicinity or would unreasonably interfere with the use or enjoyment of property in the vicinity by the occupants thereof for lawful purposes or endanger the public peace, health, *216 safety or general welfare, such plan shall be rejected or shall be so modified or conditioned before adoption as to remove the objections.
Neighbors assert that the City had a “special relationship” with Neighbors pursuant to the first exception to the public duty doctrine because they fall within the specific class of persons whom these ordinances are intended to protect from a particular type of harm.
¶22 We must, determine whether the legislative body that passed these ordinances intended them to benefit the general public, or, on the other hand, to protect a specific class of persons from a particular type of harm. Nelson, ¶ 22. We interpret an ordinance by looking first to its plain language. Small v. Board of Trustees, 2001 MT 181, ¶ 21, 306 Mont. 199, ¶ 21, 31 P.3d 358, ¶ 21. We will not determine legislative intent based upon the wording of any particular section or sentence, however, but only from a consideration of the statute as a whole. In re Marriage of McMichael, 2006 MT 237, ¶ 14, 333 Mont. 517, ¶ 14, 143 P.3d 439, ¶ 14. We interpret an ordinance to give effect to its purpose and to avoid absurd results. In re McMichael, ¶ 14.
¶23 The ordinances at issue in this case are part of Title 17 of the City of Hamilton Municipal Code of 1999 (Title 17). Title 17 is entitled “Zoning Ordinance of the City of Hamilton.” Hamilton Mun. Code at § 17.04.010. Title 17 seeks to “regulate and promote the orderly and harmonious development of the city and its environs ....” Hamilton Mun. Code at § 17.04.020. Title 17 states that the “regulations and restrictions established in this Title 17 have been made in accordance with a comprehensive master plan ....” Hamilton Mun. Code at § 17.04.030. This master plan serves to (1) “Lessen congestion in the streets;” (2) “Secure safety from fire, panic and other dangers;” (3) “Promote health and general welfaref (4) “Provide adequate light and air;” (5) “Prevent overcrowding of land;” (6) “Avoid undue concentration of population;” and (7) “Facilitate adequate provisions for transportation, water, sewage, schools, parks and public requirements.” Hamilton Mun. Code at § 17.04.030 (emphasis added). These provisions indicate that the City intended Title 17 to benefit the general public, rather than a circumscribed class of persons.
¶24 The Dissent implies some sort of sinister motive in noting the fact that the Court obtained the complete version of Title 17 of the Hamilton Municipal Code “from the City of Hamilton in the course of writing the Opinion in this case.” Second Dissent, ¶ 62, fn.l. The Dissent presumably also would be troubled by the prospect of the Court obtaining a complete version of a statute contained in the *217 Montana Code Annotated in the course of writing an opinion. We are at a loss to understand the Dissent’s apparent concern with the Court obtaining a complete version of the legislative enactment that the parties seek it to interpret when the parties have failed to provide a complete version. Parties rarely, if ever, provide the Court with a complete version of a title to the Montana Code Annotated when they seek to have the Court interpret a section of that title. In fact, this situation occurs with such frequency that the Court provides complete sets of the entire Montana Code Annotated to each Justice on this Court.
¶25 Neighbors ignore the express purpose of Title 17 and focus instead on the mandatory language in § 17.116.050. They argue that the language in § 17.116.050 protects a specific class of persons from a particular type of harm. Neighbors point out that the language in § 17.116.050 identifies “occupants” of nearby property as the class of persons to be protected. Neighbors also point out that the ordinance identifies the “use or enjoyment” of the property as the harm from which to protect the occupants. Hamilton Mun. Code at § 17.116.050.
¶26 Section 17.116.050’s requirement that the Board consider individual interests in particular land use decisions does not change the fact that Title 17’s express purpose is to promote the general welfare. Section 17.116.050 provides for the procedure by which the City reviews proposed development plans in order to “provide for orderly development of property to insure compatibility to the surrounding existing and planned land uses.” Hamilton Mun. Code at § 17.116.010. We construe § 17.116.050 as one of the procedures by which the City provides for “orderly development” of property to promote the general welfare, not as an expression of the City’s intent to protect anyone who lives in the vicinity of a permitted development from depreciation in property values or an “unreasonable interference with the use and enjoyment of their property.”
¶27 Moreover, Neighbors’ interpretation of the Precise Plan of Design ordinances would impose an overwhelming burden on the City with potentially adverse consequences. Almost any proposed land development could lead to depreciation in property values or an “unreasonable interference” with a neighbor’s use or enjoyment of property. The City would be forced either to deny all but the most benign development plans or face innumerable lawsuits. We do not think that the legislative body that passed these Precise Plan of Design ordinances intended them to place such an undue constraint on the City’s discretion to promote the general welfare. In re McMichael, ¶ 14. *218 We conclude, as a matter of law, that Hamilton City Ordinances § 17.116.010 and § 17.116.050 do not create a “special relationship” between the City and the Neighbors. Thus, the City, pursuant to the public duty doctrine, had no “special duty” to protect the Neighbors from any harm that might result from the City’s adoption of the Plan. ¶28 The Dissents argue that the City intended Title 17 to benefit individual landowners rather than the general public in light of the fact that § 17.116.050 protects “a specific class of persons from a particular type of harm.” First Dissent, ¶ 53; Second Dissent, ¶ 63. We determine the intent of a statute, however, by reading the statute as a whole. In re McMichael, ¶ 14. We will not defeat the express purpose of Hamilton’s zoning regulation-to promote the general welfare-by focusing on a single procedure within Title 17.
¶29 The Dissent implies that we often defeat governmental immunity by looking to a specific provision within a larger statute. The Dissent cites State v. District Court, 246 Mont. 225, 805 P.2d 1272 (1990), and Newville v. State, Dept. of Family Services, 267 Mont. 237, 883 P.2d 793 (1994), for the proposition that procedures within a statute should be construed as “a promise by a governmental entity to a class of persons ensuring something.” First Dissent, ¶ 52. These cases address quasi-judicial immunity, however, not the public duty doctrine.
¶30 We do not face here the question of whether the Board has quasi-judicial immunity over decisions made pursuant to § 17.116.050. Here we face the question of whether the City intended Title 17-as a whole-to benefit the public welfare, or, on the other hand, a circumscribed class of persons. The express language in Title 17 indicates that the City intended it to benefit the public as a whole, rather than a circumscribed class of persons. Hamilton Mun. Code at §§ 17.04.020, 17.04.030. The Dissent’s forced march through this Court’s public duty doctrine precedent fails to identify any support for its proposition that the City of Hamilton intended Title 17 to benefit individual landowners to the detriment of the general welfare. Both Dissents fail to provide any support for burdening a City’s land use decision-making process with innumerable lawsuits.
¶31 Other jurisdictions have refused to find that land use regulations create a “special relationship” between property landowners and the government. See e.g. Wolfe v. Bennett PS & E, Inc., 974 P.2d 355, 359 (Wash. App. Div. II 1999) (stating that “[gjovernments enact building codes, zoning ordinances, and other land use regulations to protect the health and welfare of the general public,” and citing Taylor v. Stevens County, 759 P.2d 447, 450 (Wash. 1988) (holding that “the duty to issue *219 building permits and conduct inspections is to protect the health and safety of the general public.”)); Derwort v. Polk County, 501 S.E.2d 379, 381 (N.C. App. 1998) (holding that the “plain language of the statute and our case law thus indicate that subdivision control is a duty owed to the general public, not a specific individual.”); Myers v. Moore Engineering, Inc., 42 F.3d 452, 455 (8th Cir. 1994) (noting that under Minnesota and South Dakota state law “ ‘[b]uilding codes, the issuance of building permits, and building inspections are... designed to protect the public and are not meant to be an insurance policy by which the municipality guarantees that each building is built in compliance with the building codes and zoning codes.’ ” (citations omitted)).
ISSUE TWO
¶32 Does a condition that the City places on a building modification permit impose a “special duty” on the City when it is deciding whether to enforce that condition?
¶33 Neighbors allege next that they had a “special relationship” with the City pursuant to the second exception to the public duty doctrine in light of the fact that the City undertook “specific action” to protect the Neighbors and their property. Neighbors point out that the Board added the Condition in the Resolution that Kennedy “shall comply with all federal, state and local laws.” Neighbors argue that when the City added this condition, “the City took specific action for the protection of [Neighbors], which established a ‘special relationship’ between the City and [Neighbors]....” Neighbors also argue on appeal that “[t]he City Administrator, the City Attorney and the Chief of Police all took specific action on behalf of the [Neighbors] by contacting [Kennedy] on behalf of the [Neighbors] to request that [Kennedy] control the loud music.”
¶34 Neighbors failed to argue in the District Court, however, that they had a “special relationship” with the City based on the fact that the City undertook a “specific action” to protect the Neighbors or their property. Neighbors also failed to characterize the Condition as a “specific action” that the City undertook to protect the Neighbors or their property. Neighbors mentioned the Condition only when arguing that “the City refused to enforce” the Condition.
¶35 Neighbors similarly failed to allege to the District Court that the City Administrator, the City Attorney, or the Chief of Police -undertook “specific action” pursuant to the second exception to the public duty doctrine. We are not surprised that the City and the District Court also failed to address the “specific action” exception as the Neighbors *220 premised their complaint and briefs on summary judgment on the fact that the City had failed to take action, not on the fact that the City had taken “specific action” to protect the Neighbors or their property. We will not consider arguments on appeal that the District Court did not have an opportunity to consider below. Cassady v. Yellowstone County Sheriff, 2006 MT 217, ¶ 23, 333 Mont. 371, ¶ 23, 143 P.3d 148, ¶ 23.
¶36 [6] Neighbors allege next, pursuant to the third exception to the public duty doctrine, that they were “reasonably induced to rely upon the City to enforce the [Condition and to require [Kennedy] to obey all applicable laws which were reasonably necessary to protect the [Neighbors’] interests and property.” To establish a “special relationship” under the third exception to the public duty doctrine, the Neighbors must show (1) that there has been direct contact between the public official and the plaintiff; (2) that the official has provided express assurances in response to the plaintiffs specific inquiry; and (3) that the plaintiff justifiably relied on the representations of the official. E.g. Moore v. Wayman, 934 P.2d 707, 711-12 (Wash. App. Div. II1997); see also Castellani v. Delaware State Police, 751 A.2d 934, 938 (Del. Super. 1999); see generally 57 Am. Jur. 2d Municipal, County, School and State Tort Liability § 86 (2001). We have held that “reliance occurs when one is ‘rightfully led to a course of conduct or action on the faith that the act or duty will be properly performed.’ ” Orr v. State, 2004 MT 354, ¶ 46, 324 Mont. 391, ¶ 46, 106 P.3d 100, ¶ 46 (citing Nelson v. Driscoll, 1999 MT 193, ¶ 36, 295 Mont. 33, ¶ 36, 983 P.2d 972, ¶ 36).
¶37 Neighbors argue that they “relied upon the City to their detriment, because the City refused to enforce the Condition or to enforce the applicable laws.” Neighbors’ alleged state of mind, standing alone, proves insufficient to establish “justifiable reliance.” Neighbors must point us to evidence showing that the Neighbors undertook some action, or refrained from some action, in reliance on the City’s alleged promises to enforce the Condition.
¶38 We held in Orr, for example, that a group of mine employees had met the “justifiable reliance” exception to the public duty doctrine. Orr, ¶ 46. The employees had been concerned that ambient dust in the mine might contain asbestos. Orr, ¶¶ 4, 46. The employees contended that they had concluded, however, that the dust did not pose any health risks based on the fact that the State had “regularly inspected the [m]ine, but had never reported any danger to the [m]iners.” Orr, ¶ 46. We held that the State had a “special relationship” with the employees under the third exception to the public duty doctrine because the *221 State’s inspections had “rightfully led” the employees to believe that it was safe for the miners to continue working in the mine. Orr, ¶¶ 46-47.
¶39 Neighbors, unlike the employees in Orr, do not allege that the City “rightfully led” the Neighbors to start, stop, or continue taking any particular course of action. Neighbors instead focus on the City’s course of conduct not to enforce the Condition. Neighbors fail to recognize that though the City’s subsequent failure to abide by its alleged promise to enforce the Condition in the Resolution may be relevant to the question of whether the City breached a “special duty,” it has no relevance to the question of whether the City had a “special duty’ in the first place. Orr, ¶ 46.
¶40 Moreover, Neighbors have contradicted their own claims that the City assured them of action by admitting in discovery that “[n]ot once did we ever receive assurance or even a response, from the City, that our complaints and our suffering were priorities, or even problems they intended to solve some day.” Neighbors respond that this discovery answer referred only to the City Council.
¶41 Neighbors argue in the alternative that various City officials, other than the City Council, did give them specific assurances. For example, Neighbors allege that the City Attorney wrote a letter to Kennedy on December 12,2001, that warned Kennedy to “immediately reduce and regulate the loudness of the music and other noise emanating from your business.” Neighbors point to two legal memoranda that the City Attorney forwarded to the City Administrator that “address[ed] some of the issues that have been raised regarding nuisance complaints by some of the area residents.” Neighbors also cite to a handwritten note that the Mayor wrote to the Neighbors where the Mayor stated that he had reviewed a video of the disturbances at Kennedy’s casino, and that the Mayor would notify the Neighbors if he needed to meet with them. Neighbors finally point to several entries in the Neighbors’ “diary” of the events in this case where they indicate they had meetings with various City officials. Neighbors fail to point to any language in these documents, however, where a City official expressly promised the Neighbors that that official would enforce any particular law or condition.
¶42 We determine that the City has established that no genuine issue of material fact exists with respect to whether the City and the Neighbors had a “special relationship” pursuant to the public duty doctrine. We conclude as a matter of law that the City owed no “special duty” to the Neighbors, thus, we decline to address the Neighbors’ remaining claims on breach, causation, and damages.
*222 ¶43 We do not doubt or minimize the disruption to the lives of the Neighbors allegedly caused by Kennedy’s operation of the casino. The videotapes contained in the record demonstrate repeated and continuous disruptions in the form of loud music, revving car engines, fights, and arguments into the wee hours of the morning. We hold only that the Neighbors must seek redress for these claimed injuries against Kennedy, whose operation of the casino has caused these alleged harms. Affirmed.
CHIEF JUSTICE GRAY, JUSTICES WARNER and RICE concur.