CHIEF JUSTICE GRAY
delivered the Opinion of the Court.
¶1 Doris Nelson (Doris) appeals from the order of the Twelfth Judicial District Court, Liberty County, granting summary judgment to the State of Montana (State) and denying her motion for partial summary judgment. We reverse in part, but ultimately affirm.
¶2 We address two dispositive issues:
¶3 1. Is the Board of Medical Examiners entitled to quasi-judicial immunity for its actions in granting a medical license to a physician who was subject to disciplinary action for unprofessional conduct in other states?
¶4 2. Did the State owe a duty of care to Emil J. Nelson?
*208 BACKGROUND
¶5 In October of 1995, Dr. Thomas Stephenson (Stephenson) applied for a medical license to the Board of Medical Examiners (Board), which at the time was overseen by the Montana Department of Commerce. After 20 years of practice as a cosmetic surgeon in California, Stephenson sought to practice general medicine in Montana. Stephenson’s application showed he graduated from medical school in 1962, and had obtained medical licenses in California and Florida. Materials submitted with the application disclosed that in 1994, Stephenson’s California medical license had been revoked, but that the revocation was stayed pending Stephenson’s successful completion of 10 years probation with conditions, including 120 days suspension and a ban against practicing cosmetic surgery during probation. The disciplinary action resulted from Stephenson’s unprofessional conduct in violation of the California Business and Professions Code. His application stated he violated Business and Professions Code § 651, false claims in advertising; § 810, fraudulent insurance claims; § 2234(a), treatment of patients; § 2234(b), gross negligence in treating patients; § 2234(c), repeated negligence in treating patients; § 2234(e), dishonesty and corruption in treatment of patients; § 2234(f), engaging in conduct which would have warranted the denial of a license because of his treatment of patients; and § 2261, signing medical documents containing false facts. With regard to the California revocation, Stephenson’s application materials also revealed alcohol abuse and Demerol addiction, 11 malpractice suits, bankruptcy, and a history of poor and illegible medical records. In addition, his Florida license was suspended for failure to notify the Florida medical board of the actions taken against his license in California. The application also indicated Stephenson had taken a recent medical refresher course in Pennsylvania.
¶6 The Board requested additional information and determined Stephenson should appear before it for a personal interview. During the interview, the Board questioned him about the disciplinary action in California and his plans for practice in Montana. As a result of that meeting, the Board tabled the application and requested more information from the Fort Belknap Indian Health Hospital in Montana, where Stephenson had worked for several months. At some point during the process, the Board contacted Stephenson’s California probation officer with regard to the reported Demerol addiction. The probation officer apparently stated she was new and not aware of a Demerol problem. The record reflects no further inquiry about *209 Demerol. The Board contacted three doctors Stephenson listed as references, but did not contact persons involved with the California medical board decisions, the malpractice suits, or the physicians involved in his refresher course in Pennsylvania.
¶7 The Board held a second personal interview with Stephenson in July of 1996, during which it voted to issue Stephenson a temporary license for one year based on several conditions. The Board informed Stephenson that if he did not accept the conditions, it would give him notice of a proposed denial of a license and the opportunity to contest the denial in a formal hearing. Stephenson accepted the conditions, and the Board issued Stephenson a temporary license. Upon Stephenson’s request, the Board modified various conditions of the temporary license in May and July of 1997.
¶8 The Board extended Stephenson’s temporary license subj ect to the imposed conditions in November of 1997 and again in March of 1998, to allow time to complete a peer review prior to addressing whether to grant Stephenson a permanent license. In January of 1999, the Board granted Stephenson a full, unrestricted, permanent license to practice medicine in Montana.
¶9 In November of 1999, Stephenson conducted a routine physical examination of Emil J. Nelson (Jack). Upon examining Jack’s abdomen, Stephenson noted Jack possibly had an abdominal aneurysm. He stated in the medical chart that Jack would present the following week for an x-ray. Jack experienced an abdominal aneurysm rupture six days later, however, and died as a result.
¶10 Doris filed a complaint against the State as personal representative of Jack’s estate, individually as Jack’s widow, and on behalf of Jack’s heirs. She alleged that the State negligently and in violation of statute granted and renewed a temporary medical license to Stephenson, and then negligently and in violation of statute granted a full, unrestricted physician’s license to Stephenson, when he had been subject to discipline for unprofessional conduct in other states. The complaint, filed in the First Judicial District Court, Lewis and Clark County, also named Stephenson; Liberty County; the Liberty County Hospital; Triangle Health Care; Triangle Health Care, PLLP; and Dr. Richard Buker. The State moved to dismiss, arguing the Board was entitled to quasi-judicial immunity. The First Judicial District Court, Lewis and Clark County, denied the motion to dismiss, determining the Board’s decisions were not protected by quasi-judicial immunity because they were not made during the adjudication of a dispute or controversy. Several of the other defendants requested a *210 change of venue to the Twelfth Judicial District Court, Liberty County, which the court granted.
¶11 The State subsequently moved for summary judgment, arguing it was entitled to quasi-judicial immunity for the Board’s actions or, alternatively, that the State owed no duty of care to Jack. Doris responded and moved for partial summary judgment, arguing that the State was not entitled to quasi-judicial immunity and that it owed a duty of care to Jack in licensing Stephenson. The District Court issued an order granting the State’s motion-and denying Doris’s motion-on the issue of quasi-judicial immunity. Doris appeals.
STANDARD OF REVIEW
¶12 Summary judgment should be granted only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Prindel v. Ravalli County, 2006 MT 62, ¶ 19, 331 Mont. 338, ¶ 19, 133 P.3d 165, ¶ 19. Here, the parties agreed in the District Court that no genuine issues of material fact existed regarding the issues presented in their summary judgment motions.
¶13 We review a district court’s grant of summary judgment de novo, based on the same M. R. Civ. P. 56 criteria as the district court. We determine whether the district court applied the law correctly. Germann v. Stephens, 2006 MT 130, ¶ 21, 332 Mont. 303, ¶ 21, 137 P.3d 545, ¶ 21 (citations omitted).
DISCUSSION
¶14 1. Is the Board entitled to quasi-judieial immunity for its actions in granting a medical license to a physician who was subject to disciplinary action for unprofessional conduct in other states?
¶15 Doris argues the Board was performing ministerial and administrative functions in investigating Stephenson and granting him a license. She also contends the Board’s decision to grant Stephenson a license did not involve the adjudication of a controversy. The State, on the other hand, argues the Board was performing discretionary, quasi-judicial functions when it issued the license because performing a background investigation is discretionary, not mandatory. The State further argues the entire three-year process between the Board’s receipt of Stephenson’s application and its issuance of an unrestricted license was a controversy between the Board and Stephenson. Prior to reaching the specific issue before us, it is helpful to review our jurisprudence involving quasi-judicial *211 immunity.
¶16 Although Article II, Section 18 of the 1972 Montana Constitution abolished sovereign immunity, the common-law doctrines of prosecutorial and quasi-judicial immunity still exist in Montana. Koppen v. Board of Medical Examiners, 233 Mont. 214, 218, 759 P.2d 173, 175 (1988) (citations omitted). The availability of quasi-judicial immunity depends upon the procedural facts of each case in which the immunity is asserted. In some cases, quasi-judicial immunity has been available. See e.g. Koppen, 233 Mont. at 219-20, 759 P.2d at 176; Rahrer v. Board of Psychologists, 2000 MT 9, ¶ 20, 298 Mont. 28, ¶ 20, 993 P.3d. 680, ¶ 20. In others, it has not. See e.g. State v. District Court (hereinafter Great Western Sugar), 246 Mont. 225, 234, 805 P.2d 1272, 1277 (1990);Newville v. State, Dept. of Family Services, 267 Mont. 237, 269, 883 P.2d 793, 812 (1994); State Bd. Of Dentistry v. Kandarian, 248 Mont. 444, 448-49, 813 P.2d 409, 412 (1991).
¶17 In some cases, we have examined the nature of the function undertaken by an administrative entity to determine whether the function was ministerial or discretionary. Where the administrative function is mandated by statute and, thus, purely ministerial in nature, the administrative entity is not acting in a quasi-judicial manner and is not entitled to quasi-judicial immunity. See Great Western Sugar, 246 Mont. at 232-33, 805 P.2d at 1277; Newville, 267 Mont. at 268-69, 883 P.2d at 812. However, where the administrative function involves discretionary decision-making by an entity, the entity is acting in a quasi-judicial capacity for which quasi-judicial immunity is available. See Koppen, 233 Mont. at 219-20, 759 P.2d at 176.
¶18 In addressing the application of quasi-judicial immunity to an administrative entity’s actions, we also have looked to the context in which the entity was acting. In that regard, § 2-15-102(10), MCA, defines “quasi-judicial function” in terms of “an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies.” Thus, we have required that an administrative entity’s discretionary decision-making be within the context of adjudicating a controversy or adversarial-type proceeding, such as a contested case proceeding under the provisions of the Montana Administrative Procedure Act (MAPA) (§§ 2-4-101 through -711, MCA), for quasi-judicial immunity to apply. See Newville, 267 Mont. at 269, 883 P.2d at 812; Rahrer, ¶ 20; Kandarian, 248 Mont. at 447-48, 813 P.2d at 411-12.
¶19 As stated above, Doris argues the District Court erred in granting *212 the State summary judgment based on quasi-judicial immunity. She contends our case law clearly establishes that the Board was performing ministerial and administrative functions in investigating Stephenson and granting him a license, and the Board’s decision to grant Stephenson a license did not involve the adjudication of a controversy. The State first responds that, pursuant to Title 37, chapters 1 and 3 of the Montana Code Annotated (MCA), the Board’s decision-making functions relating to investigating applications and issuing temporary and permanent licenses to practice medicine are discretionary, rather than ministerial, thus entitling the Board to quasi-judicial immunity. The State contends, and Doris does not dispute, that the statutes in effect in 1997 when Stephenson was granted his license are applicable here. Consequently, all references to statutes contained in Title 37 of the MCA are to the 1997 version.
¶20 Title 37, chapter 1 of the MCA contains provisions generally applicable to all licensure and regulation of professions and occupations by the State and its agencies. Chapter 3 of Title 37 contains the provisions specific to the licensing of physicians in this State. The provisions of Title 37, chapter 1 apply to and are intended to supplement the statutes governing the Board’s actions in licensing and regulating physicians under chapter 3 unless specific provisions in chapter 3 provide otherwise. See § 37-1-303, MCA.
¶21 Section 37-3-321, MCA, provides that
[i]f the board determines that an applicant for a license to practice medicine does not possess the qualifications or character required by this chapter or that he has committed unprofessional conduct, it shall refrain from authorizing the department to issue a license. The department shall mail to the applicant, at his last address of record with the department, written notification of the board’s decision, together with notice of a time and place of a hearing before the board. If the applicant without cause fails to appear at the hearing or if after hearing the board determines he is not entitled to a license, the board shall refuse to grant the license.
In addition, § 37-1-316(7), MCA, defines “unprofessional conduct,” in part, as “denial, suspension, revocation, probation, fine, or other license restriction or discipline against a licensee by a state, province, territory, or Indian tribal government or the federal government if the action is not on appeal, under judicial review, or has been satisfied.” It is undisputed here that Stephenson’s California license was conditionally revoked and his Florida license was suspended. It further is undisputed that Stephenson had not satisfied the requirements *213 necessary to lift the conditional revocation and suspension of those licenses at the time he applied for a license in Montana.
¶22 Thus, at the time he applied for a Montana license, Stephenson had “committed unprofessional conduct.” Pursuant to § 37-3-321, MCA, the Board was required to refrain from authorizing issuance of a license to Stephenson, and the department was required to notify Stephenson of that decision and provide him with the opportunity for a hearing. The statutory “shall” language in § 37-3-321, MCA, clearly reflects mandatory, nondiscretionary duties. The Board may not avoid statutory requirements by the simple expedient of not making a determination that an applicant has “committed unprofessional conduct.” This situation is similar to those in Great Western Sugar and Newville in which we held that an agency action which is mandated by statute is ministerial in nature and cannot provide a basis for quasi-judicial immunity. Great Western Sugar, 246 Mont. at 232-33, 805 P.2d at 1277; Newville, 267 Mont. at 268-69, 833 P.2d at 812.
¶23 The State also contends the Board’s actions in investigating Stephenson’s application and issuing him a temporary, and then permanent, license meet the definition of “quasi-judicial function” set forth in § 2-15-102(10)(c), MCA (2007) (formerly § 2-15-102(9), MCA (1997)). Consequently, the State asserts entitlement to quasi-judicial immunity for those actions.
¶24 Section 2-15-102(10), MCA, provides in pertinent part as follows:
“Quasi-judicial function” means an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies. The term includes but is not limited to the functions of:
(c) issuing, suspending, or revoking licenses, permits, and certificates[.]
¶25 The State is correct that § 2-15-102(10)(c), MCA, includes the delineated actions of an agency with regard to licenses as quasi-judicial functions. The State apparently reads the statutory listing of included functions on a stand-alone basis, however, and ignores other statutory language.
¶26 This Court is obligated to read the statute in its entirety, giving meaning to all its parts and neither inserting nor omitting language therein. Section 1-2-101, MCA. The license-related language in § 2-15-102(10)(c), MCA, as well as the other listed functions delineated in the statute, are constrained by the preceding language of § 2-15-102(10), MCA, which requires an “adjudicatory function ... involving the *214 exercise of judgment and discretion in making determinations in controversies.” Thus, unless the license-related functions occur while the agency is “making determinations in controversies,” the agency action does not meet the statutory definition of “quasi-judicial function.” Absent a quasi-judicial function, quasi-judicial immunity is not available.
¶27 We previously have discussed the necessity of the existence of a controversy in determining whether an adjudicatory function is a quasi-judicial function. In that regard, we have determined that situations where an agency is conducting a contested or adversarial proceeding pursuant to the notice and hearing provisions of the MAPA and where an agency is responding to citizen complaints which are adversarial in nature involve determinations in controversies which are adjudicatory functions and, therefore, quasi-judicial functions pursuant to § 2-15-102(10), MCA. See e.g. Rahrer, ¶ 20; Great Western Sugar, 246 Mont. at 230 and 234, 805 P.2d at 1275-76 and 1278 (citing Koppen, 233 Mont. at 216, 759 P.2d at 176). It is undisputed here that no formal MAPA contested case proceeding was ever noticed or initiated during the three-year period during which the Board investigated Stephenson and issued him temporary and permanent licenses to practice medicine. It also is undisputed that the Board did not receive any citizen complaints or objections regarding Stephenson or his license application during those three years.
¶28 Notwithstanding, the State argues that the entire three-year process between the Board’s receipt of Stephenson’s application and its issuance of an unrestricted license was a controversy or adversarial proceeding between the Board and Stephenson. In support of its contention, the State points out that
the licensing process was arduous and lengthy. Stephenson appeared before the Board, either in person or by telephone, approximately a half dozen times; was required to submit to testing and educational courses in areas specified by the Board; was subjected to strict restrictions on his practice and continued oversight by the Board; and submitted to two extensive peer reviews of his diagnosis and treatment of patients.
The State’s factual recitations are correct; however, they do not support its legal argument.
¶29 “Controversy” is defined as “[a] disagreement or a dispute, esp. in public.” Black’s Law Dictionary, 354 (8th ed., West 2004). Similarly, “controvert” means “to dispute or contest; esp. to deny ... or oppose in argument ....” Black’s Law Dictionary at 354. Additionally, an *215 “adversary proceeding” is defined as “[a] hearing involving a dispute between opposing parties.” Black’s Law Dictionary at 58. Consequently, there must be some dispute between opposing parties for a controversy or adversarial proceeding to exist.
¶30 Here, the Board received Stephenson’s application for a Montana medical license in 1995; the application disclosed the conditional revocation of his California license and the suspension of his Florida license. The Board requested additional information and had Stephenson appear before the full Board for a personal interview. As a result of that interview, the Board tabled the license application, requested additional information from a health clinic in Montana where Stephenson practiced for a short time, and then requested another personal interview with Stephenson. At this second interview, the Board voted to issue Stephenson a temporary license for one year subject to several conditions, including limitations on his medical practice as well as testing and continuing education requirements. The Board informed Stephenson that if he did not accept the conditions, it would give him notice of a proposed denial of a license and give him the opportunity to contest the denial in a formal hearing. Stephenson accepted the conditions and obtained his temporary license. The Board continued to extend Stephenson’s temporary license subject to conditions, including peer reviews, and-in 1999-granted Stephenson a full, unrestricted, permanent license to practice medicine in Montana. Stephenson complied with the Board’s requests at every step of the licensing process. He did not oppose the Board’s decision to issue temporary licenses rather than a permanent license, nor did he oppose the conditions attached to issuance of the temporary licenses.
¶31 We conclude that, regardless of whether the Board’s actions in investigating Stephenson’s license application and granting him temporary and permanent medical licenses were discretionary functions, the Board’s actions were not -undertaken in the context of a controversy or adversarial proceeding as contemplated by § 2-15-102(10), MCA. We conclude, therefore, that the Board is not entitled to quasi-judicial immunity for its actions in granting a medical license to Stephenson. Consequently, we hold the District Court erred in granting the State’s motion for summary judgment on that basis.
¶32 2. Did the State owe a duty of care to Jack Nelson?
¶33 Doris alleged in her complaint that the State acted negligently and in violation of statute in investigating Stephenson’s license application and granting him temporary and permanent medical licenses. In its answer, the State asserted the public duty doctrine as *216 an affirmative defense. It also raised the doctrine as an alternative basis in support of its motion for summary judgment in the District Court. The State argued it owed no duty of care to Jack Nelson because the medical licensing statutes benefit the general public and do not create a special duty to an individual to protect from, or insure against, the negligent actions of a third party.
¶34 The District Court, having granted the State summary judgment based on quasi-judicial immunity, did not address the State’s public duty doctrine argument. We held above, however, that the State is not entitled to quasi-judicial immunity here and, as a result, we address the issue of whether the State owed a duty of care to Jack Nelson. We do so under our longstanding practice of affirming a trial court’s result, even if that result was based on incorrect reasoning. See e.g. In re Trust B, 2008 MT 153, ¶ 19, 343 Mont. 240, ¶ 19, 184 P.3d 296, ¶ 19; Wells Fargo Bank v. Talmage, 2007 MT 45, ¶ 23, 336 Mont. 125, ¶ 23, 152 P.3d 1275, ¶ 23. We further observe that whether a legal duty exists can be determined as a matter of law. Eklund v. Trost, 2006 MT 333, ¶ 32, 335 Mont. 112, ¶ 32, 151 P.3d 870, ¶ 32.
¶35 “The public duty doctrine provides that a governmental entity cannot be held liable for an individual plaintiffs injury resulting from a governmental officer’s breach of a duty owed to the general public rather than to the individual plaintiff.” Massee v. Thompson, 2004 MT 121, ¶ 41, 321 Mont. 210, ¶ 41, 90 P.3d 394, ¶ 41. The rationale underlying this doctrine is that “a duty owed to all is a duty owed to none.” Nelson v. Driscoll, 1999 MT 193, ¶ 21, 295 Mont. 363, ¶ 21, 983 P.2d 972, ¶ 21.
¶36 An exception to the public duty doctrine exists when there is a special relationship between the governmental entity and the plaintiff which gives rise to a special duty that is “more particular than the duty owed to the public at large.” Nelson, ¶ 22. A special relationship can be established in one of four ways:
(1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.
Nelson, ¶ 22 (citations omitted). In Nelson, we concluded an exception to the public duty doctrine existed under the second criteria because *217 the law enforcement officer had taken specific actions to ensure the decedent’s safety and, by those actions, the officer assumed the duty to protect the decedent from harm. Nelson, ¶ 38.
¶37 In the present case, the issue is whether a special relationship was created between the Board and Jack via a statute. If so, an exception to the public duty doctrine exists and the State owed a duty to Jack. We begin with a brief review of our cases addressing this issue.
¶38 In Massee, three sons sued Broadwater County and the county sheriff for the wrongful death of their mother (Vickie), who had been fatally shot by her husband (Ray). Massee, ¶ 1. Vickie and Ray had a tumultuous relationship, including many encounters in which Ray threatened physical harm to both Vickie and himself using a .44 magnum pistol. These encounters resulted in numerous contacts with sheriffs deputies and the sheriff himself. Massee, ¶¶ 5-19. Eventually, Ray fatally shot Vickie and then killed himself with the pistol. Massee, ¶ 20. Vickie’s sons alleged that the sheriff had negligently failed to take appropriate action to prevent Ray from killing Vickie. A jury returned a verdict in favor of the sons, but the trial court subsequently vacated the verdict and granted judgment as a matter of law to the defendants. Massee, ¶¶ 21-22. The trial court determined, in part, that no special relationship existed between the sheriff and Vickie and, consequently, the sheriff had no legal duty to protect her from Ray. Massee, ¶ 23.
¶39 On appeal, we addressed whether a special relationship existed between Vickie and the sheriff so as to create an exception to the immunity provided by the public duty doctrine. Specifically, we addressed creation of a special relationship via a statute intended to protect a specific class of persons of which the injured party is a member from a particular type of harm. Massee, ¶¶ 42-43. Two domestic violence statutes in effect at the time of Vickie’s death were at issue in Massee. It was undisputed that the two statutes were enacted to protect the specific class of persons who are victims of domestic violence, that Vickie was a member of that specific class of persons and that, as a result, the sheriff owed a special duty to Vickie as a member of the protected class of domestic abuse victims. Massee, ¶ 43. We concluded, therefore, that an exception to the public duty doctrine existed. Massee, ¶ 44.
¶40 We again addressed the first exception to the public duty doctrine in Eklund. There, Roy Trost escaped from a youth detention center and was driving a stolen vehicle. Eklund, ¶¶ 10-12. Law enforcement *218 officers pursued Mm at a Mgh rate of speed as they entered Harlowton, Montana, in Wheatland County. Trost lost control of the vehicle and struck Donald Eklund. Eklund, ¶¶ 15 and 17. Eklund sued Trost, Wheatland County and the Wheatland County Sheriff, among others, alleging negligence. Eklund, ¶ 18. The county and the sheriff argued that no exception to the public duty doctrine existed because the statute on which Eklund relied did not create a special relationship. Eklund, ¶ 35. The district court concluded no exception to the public duty doctrine existed and granted summary judgment to the county and the sheriff on that basis; Eklund appealed. Eklund, ¶ 31.
¶41 We first observed on appeal that, in the context of claims against law enforcement officers, the public duty doctrine expresses the policy that an officer’s overarching duty to protect and preserve the peace is owed to the public at large, not to individual members of the public. Eklund, ¶ 33 (citing Nelson, ¶ 21). In determining whether the public duty doctrine applied, we addressed whether a special relationsMp was created by a statute intended to protect a specific class of persons of which the plamtiff is a member from a particular type of harm. Eklund, ¶ 35.
¶42 The statute at issue, § 61-8-107, MCA (2003), provided in pertinent part:
(2) The driver of a police vehicle or authorized emergency vehicle may:
(b) proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
(c) exceed the speed limits so long as he does not endanger life or property;
(4) The foregoing provisions shall not relieve the driver of a police vehicle ... from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.
Eklund, ¶ 36. Although the statute uses general terms, “all persons” and “others,” we held that the statute imposed a duty on drivers of law enforcement vehicles and created “a special class of persons-those, who by use of the streets and highways are potential victims of a high speed chase-to whom the duty is owed.” Eklund, ¶ 39. Thus, a special relationship was established and the public duty doctrine did not apply. Eklund, ¶ 39.
*219 ¶43 We addressed the first exception to the public duty doctrine again recently in Prosser v. Kennedy Enterprises, Inc., 2008 MT 87, 342 Mont. 209, 179 P.3d 1178. There, Kennedy purchased property zoned for commercial use in Hamilton, Montana; the property was bordered to the west by property zoned for residential use. Kennedy then approached the Hamilton City Zoning Board of Adjustment (Board) with a plan to modify the original restaurant on her property for use as a casino and lounge. The Board eventually approved the plan-including a condition that Kennedy comply with all federal, state and local laws-and issued a certificate of occupancy. Prosser, ¶¶ 5-6. Neighbors living in the residentially-zoned properties to the west of Kennedy subsequently sued both Kennedy and the City, alleging in part that the Board had violated City ordinances in approving Kennedy’s plan, and that various City officials had failed to abate a nuisance at the casino and failed to take legal action against Kennedy when requested by the plaintiffs. Prosser, ¶ 8. The district court granted summary judgment to the City on all claims. Prosser, ¶ 9. Specifically, the court concluded that the City owed no duty to the neighbors because no special relationship existed between the City and the neighbors which would create an exception to the public duty doctrine. Prosser, ¶ 12.
¶44 The plaintiffs argued on appeal that a special relationship existed between them and the City pursuant to two City ordinances imposing a special duty on the City to protect them when approving Kennedy’s proposed plan to modify the property. They contended that language in the two ordinances created a specific class of persons-those persons who are occupants of property in the vicinity of property which is the subject of a proposed plan-of which the plaintiffs were members and whom the two ordinances were intended to protect. Thus, the plaintiffs asserted, an exception to the public duty doctrine existed. Prosser, ¶ 21.
¶45 We concluded the two ordinances at issue were subparts of a grouping of City zoning ordinances, the entirety of which was intended to promote the general welfare and benefit the general public rather than a circumscribed class of persons. Prosser, ¶ 23. Consequently, no special relationship existed between the City and the plaintiffs which would provide an exception to the public duty doctrine. Prosser, ¶ 27.
¶46 Returning to the present case, the question is whether the statutes governing the regulation of the practice of medicine contained in Title 37, Chapter 3 of the MCA, were intended to protect a specific class of persons of which Jack was a member from a particular type of *220 harm. If so, the statutes created a special relationship between the State and Jack which would constitute an exception to the public duty doctrine.
¶47 Section 37-3-101, MCA, provides:
Purpose. It is hereby declared, as a matter of legislative policy in the state of Montana, that the practice of medicine within the state of Montana is a privilege granted by the legislative authority and is not a natural right of individuals and that it is deemed necessary, as a matter of such policy and in the interests of the health, happiness, safety, and welfare of the people of Montana, to provide laws and provisions covering the granting of that privilege and its subsequent use, control, and regulation to the end that the public shall be properly protected against unprofessional, improper, unauthorized, and unqualified practice of medicine and to license competent physicians to practice medicine and thereby provide for the health needs of the people of Montana. [Emphasis added.]
On its face, the clear language of this statute speaks in terms of protecting the entire public-the people of Montana-via the licensing of health care providers. The statute’s “intended beneficiaries” are all of the citizens of the state who receive medical care. Thus, as in Prosser, the explicit legislative policy and rationale for Title 37, Chapter 3 of the MCA creates an overarching duty to protect and provide for the health and welfare of Montanans. The duty is owed to the public at large. Nothing in the statutory language supports a legislative intent to protect a specific class of persons from a particular type of harm.
¶48 Section 37-3-101, MCA, is readily distinguishable from those statutes addressed in Massee and Eklund which produced different conclusions. Massee dealt with the specific, limited situation of a domestic abuse incident under which the law enforcement officer had specific statutory duties to advise the victim of her rights as a victim and to confiscate the weapon used in the incident. These legislatively-imposed duties owed to a specified class of Montanans-domestic abuse victims-created a special relationship between the officer and the victim. Similarly, Eklund addressed the specific situation of a high speed chase and the officers’ statutory duty to drive with due regard for safety in that situation. Again, the statutory duty was owed to a specified class of Montanans-those occupying the streets during a high speed chase-and, therefore, created a special relationship.
¶49 Such specificity is lacking in § 37-3-101, MCA. Rather, this statute *221 directs the State to regulate all physicians for the benefit and protection of all Montanans. The present case is more analogous to the situation in Prosser, where the two city ordinances cited by the plaintiffs as creating a special relationship between them and the city were subparts of a grouping of ordinances intended in their entirety to promote the general welfare and benefit of the public at large. Here, Title 37, Chapter 3 of the MCA contains numerous statutes, the entirety of which-as stated in § 37-3-101, MCA-are intended to benefit and protect all the people of Montana.
¶50 We conclude that § 37-3-101, MCA, is not “a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm,” and, therefore, the statute does not create a special relationship between the State and Jack giving rise to a special duty. Thus, we further conclude that the statutory special relationship exception to the public duty doctrine does not exist. We hold the State did not owe a duty of care to Emil J. Nelson.
¶51 We concluded above that the District Court erred in granting the State summary judgment based on the court’s determination that the Board was entitled to quasi-judicial immunity. The District Court did not reach the public duty doctrine issue before it, but we may affirm a trial court’s ruling where that court reaches the correct result, even if its reasoning is incorrect. In re Trust B, ¶ 19; Wells Fargo Bank, ¶ 23. Because the State owed no duty of care to Jack, we hold that the District Court did not err in granting summary judgment to the State.
¶52 Affirmed.