DA 08-0566

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 277

LEAH GONZALES,

      Plaintiff and Appellant,

  v.

CITY OF BOZEMAN, MONTANA; BOZEMAN POLICE
DEPARTMENT; KAYCEE ANDERSON, GREG MEGARGEL,
GALLATIN COUNTY, MONTANA; GALLATIN COUNTY
SHERIFF'S DEPARTMENT; JAKE WAGNER and DON
PETERSON, and the GALLATIN COUNTY 911
COMMUNICATIONS DEPARTMENT,

      Defendants and Appellees.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV 06-245A
Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jennifer Wendt Bordy, P.C. (argued); Attorney at Law, Bozeman,
          Montana

      For Appellees:

          Harlan B. Krogh (argued); Crist, Krogh & Nord, LLC, Billings, Montana
          (for City of Bozeman and Bozeman Police Department)

          Pamela D. Bucy; Luxan & Murfitt, Helena, Montana
          (for Kaycee Anderson and Greg Megargel)

          Steven R. Milch; Crowley Fleck, PLLP, Billings, Montana
          (for Gallatin County, Montana; Gallatin County Sheriff's Department;
          Jake Wagner; Don Peterson and Gallatin County 911)

Argued: May 4, 2009
Submitted: May 20, 2009
Decided: August 24, 2009

Filed:

Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Leah Gonzales appeals from the July 30, 2008, orders of the District Court of the Eighteenth Judicial District Court, Gallatin County, granting summary judgment to the defendants.  We affirm.

¶2      Gonzales raises several issues on appeal that we restate as follows:

¶3      Issue One: Whether the District Court properly concluded that the public duty doctrine bars Gonzales' claims.

¶4      Issue Two:  Whether Gonzales was unlawfully arrested.

## PROCEDURAL AND FACTUAL BACKGROUND

¶5      On the evening of April 3, 2005, Gonzales was the lone clerk at a Town Pump store on East Main Street in Bozeman, Montana.  At 9:55 p.m. a man later identified as transient Jose Mario Gonzalez-Menjivar entered the store wearing a ski cap.  He held a knife to Gonzales' throat and demanded money.  Gonzales was able to surreptitiously dial 911 on her cell phone shortly after Menjivar entered the store but could not talk to anyone and never knew whether the call went through.  In the meanwhile, Gonzales began removing money from the safe, which was limited by a security device to dispensing $100 every two or three minutes.

¶6      Gonzales' 911 call did go through to Gallatin County dispatch, and dispatchers heard enough on the open line to understand that there was a robbery in progress somewhere.  Dispatch notified Bozeman Police that there was a robbery in progress somewhere in the city, and officers began checking open businesses.  Meanwhile,

3

dispatchers worked quickly to identify the location of the robbery. They used a law enforcement database called I/LEADS to determine that the call had been made from a cell phone number registered to Gonzales, and that her last known employment was a Town Pump. The system gave the telephone number of the Town Pump store where Gonzales was last known to work, but not its address. Dispatcher Pickering used a phone book to match the phone number in the I/LEADS system to the Town Pump on East Main Street. She "screamed it's the East Main Town Pump, turned around and high-fived the chaplain" and notified officers of the probable location of the crime.

¶7 Officers responded to the East Main Town Pump and saw that the business was dark and appeared to be closed. Sgt. Megargel directed responding officers to begin establishing a perimeter around the building. An officer approached the building and determined that one of the doors was unlocked and then retreated, while other Bozeman Police and Gallatin County Sheriff's Department officers arrived. Officers approached the building again, saw a man inside wearing a hooded sweatshirt, and then withdrew to the perimeter. Officers saw shadowy figures of two people inside the store.

¶8 In the meanwhile, Menjivar had picked up Gonzales' cell phone from the counter and closed it, cutting off the connection with the dispatchers. Their calls back to Gonzales' cell phone were not answered. Dispatchers called the land line for the Town Pump store, and when the phone rang Menjivar picked it up, inadvertently pressed a "talk" command and placed the phone in his pocket. This left the line open. Dispatchers discerned a male and a female voice, but had difficulty hearing what was happening because the phone was in Menjivar's pocket.

4

¶9    At 10:12, Menjivar forced Gonzales into a restroom and during the next four minutes, raped her.  Neither the dispatchers nor the officers at the scene knew that this was happening.  The dispatchers testified that they would have immediately notified the officers if there had been any indication that Gonzales was being raped.

¶10    Sgt. Megargel believed that there could be a barricaded suspect with a hostage in the Town Pump.  He requested a K-9 dog team and special response team.  Menjivar and Gonzales left the bathroom and Gonzales continued to obtain money from the safe.  The officers had not yet announced their presence at the scene.  During the event Menjivar repeatedly threatened Gonzales with death and continued to hold a knife on her.

¶11    During these events the responding officers knew there were two people in the Town Pump but never knew whether there were more than two.  From time to time they could see "shadows moving" in the dark building.  Dispatch informed officers that there was a transient camp near the store and that persons from the camp could be inside the store.  Officers investigated another report of a person moving on foot through the area who turned out to be a jogger.  Officers did not know how many perpetrators or victims were involved or how any perpetrators were armed.

¶12    Menjivar left the store at 10:28 and was immediately arrested outside.  Officers then shouted commands demanding that anyone else in the store come out.  The deputy with the K-9 dog gave commands for anyone inside to come out or he would release the dog.  Gonzales then came out of the store barefoot and wearing a Town Pump apron.  She testified that officers directed her to show her hands and to lie on the ground and that she complied.  Officer Kaycee Anderson, one of the defendants, handcuffed Gonzales and

5

performed a pat-down search during which Gonzales said that she had been raped. Anderson immediately got Gonzales to her feet and walked her to a safe location at a police car and removed the handcuffs. Anderson asked Gonzales if she needed an ambulance, and Gonzales said that she did not because she was not hurt. Anderson drove Gonzales to the hospital for treatment. Gonzales confirmed Anderson's description of these events and testified that she was on the ground in handcuffs for about 30 seconds. Neither Menjivar nor Gonzales knew that law enforcement officers were on the scene prior to leaving the store.

¶13 While Anderson was dealing with Gonzales officers were moving in to secure the building, giving commands for anyone else to come out of the store. They secured the building without finding anyone else inside. Officers did not know that Gonzales had been raped until she came out and told Anderson.

¶14 Officers did not know that Gonzales was the female voice that had been heard by dispatchers in the store until she came out and was identified by Anderson based upon a prior contact. Anderson knew from the prior contact that Gonzales was pregnant, but there was no evidence that any of the other officers knew this or that they could determine the pregnancy from Gonzales' appearance.

¶15 While Officer Anderson suspected when Gonzales came out that she was the clerk in the store, officers could not immediately confirm this and the building was not yet secured. Sgt. Megargel explained why the officers at the scene could not assume that Gonzales was the victim in sole reliance on the information from dispatch that they had heard two voices:

6

Based on my training and experience in my almost 13 years of law enforcement, I could see why—we can't make assumptions. I mean, that what they told us that there was. But until I see what there is and until I know what there is, you know, I could assume in the back of my mind that the information is accurate and correct, but I would be doing myself an injustice to assume that there was only two people, and one male and one female. That would put me at risk, that would put my shift at risk, that would put the citizens at risk, it would put the victim at risk and it will put the suspect at risk. We didn't assume anything.

Therefore, they secured Gonzales and confirmed her identity and status as quickly as possible (about 30 seconds) after she came out of the store.

¶16 Gonzales sued Bozeman and Gallatin County law enforcement agencies, several officers individually, and Town Pump. The government defendants removed the action to United States District Court, where the court granted their motions for summary judgment and dismissed all of the claims brought under 42 U.S.C. § 1983. Gonzales then re-filed the action in state court and settled with Town Pump. The District Court granted summary judgment to the Bozeman and Gallatin County defendants and Gonzales appeals.

¶17 Menjivar was charged with and pled guilty to rape, robbery and aggravated kidnapping. In March, 2006, he was sentenced to a term of 180 years in the Montana State Prison.

## STANDARD OF REVIEW

¶18 This Court reviews de novo a district court's decisions on summary judgment, applying the same criteria as the district court, found in M. R. Civ. P. 56. *Watson v. Dundas*, 2006 MT 104, ¶ 16, 332 Mont. 164, 136 P.3d 973.

## DISCUSSION

7

¶19 Gonzales claims that the Bozeman and Gallatin County defendants negligently responded to the situation at the Town Pump, allowing Menjivar to rape her and that they then improperly arrested her when she came out of the store. A negligence claim depends upon establishment of a legal duty on the part of the defendant, breach of that duty, causation, and damages. *Lopez v. Great Falls Pre-Release Services*, 1999 MT 199, ¶ 18, 295 Mont. 416, 986 P.2d 1081. Determination of the existence of a duty is an issue of law. *Lopez*, ¶ 31.

¶20 The issue here is whether the Bozeman and Gallatin County defendants owed a duty to the plaintiff while responding to the situation at the Town Pump. The District Court held that they had no duty. The general rule, often called the public duty doctrine, is that a law enforcement officer has no duty to protect a particular person absent a special relationship because the officer's duty to protect and preserve the peace is owed to the public at large and not to individual members of the public. *Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, 983 P.2d 972; *Eves v. Anaconda-Deer Lodge County*, 2005 MT 157, ¶ 9, 327 Mont. 437, 114 P.3d 1037. Despite the public duty doctrine, a government officer may have an actionable duty to a particular individual if the officer is in a "special relationship" with that individual. There are four recognized situations in which a special relationship has been found: (1) where a statute intended to protect a specific class of persons from a particular type of harm imposes a duty; (2) where the government agent undertakes a specific action to protect a person or property; (3) where government action reasonably induces detrimental reliance by a member of the

8

public; and (4) where the government has actual custody of the plaintiff or of a third person who harms the plaintiff. *Nelson*, ¶ 22.

¶21 While not expressly decided under the public duty doctrine, other decisions from this Court have considered whether there is a duty to protect when a governmental agent has actual custody of the plaintiff or of a third person who harms the plaintiff. *Lopez*; *LaTray v. City of Havre*, 2000 MT 119, 299 Mont. 449, 999 P.2d 1010; *Prindle v. Ravalli County*, 2006 MT 62, 331 Mont. 338, 133 P.3d 165. In *Prindle* this Court noted the "obvious similarity" between these cases and the public duty doctrine and that it may be appropriate "in the future" to "weave these parallel strands of authority together." *Prindle*, ¶ 26. We do so now. The decisions in *Lopez*, *LaTray* and *Prindle* all involve application of the fourth "special relationship" exception to the public duty doctrine identified in *Nelson*. As stated in *Nelson*, a duty may arise as an exception to the public duty doctrine when the governmental agent "has actual custody of the plaintiff or of a third person who causes harm to the plaintiff." *Nelson*, ¶ 22. Therefore, the decisions in *Lopez*, *LaTray* and *Prindle* should not be regarded as a separate line of authority to be applied in addition to the public duty doctrine. Rather, those decisions should be regarded as applicable to the issue of whether there is a custody or control exception to the public duty doctrine.

¶22 The District Court below held that the public duty doctrine applied to the claims against the City of Bozeman, Gallatin County and the individual officer defendants. The District Court also found that none of the *Nelson* special relationship exceptions applied and that therefore the defendants owed no duty to protect Gonzales from Menjivar.

9

¶23 Gonzales' arguments on appeal emphasize applicability of the fourth *Nelson* exception, which arises when the government has actual custody or control of the plaintiff or a third person who harms the plaintiff. This exception arises, in part, from the Restatement (Second) Torts, § 319, which provides:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Before that section and the exception apply, the officer must take charge of the third person. We have held that an officer takes charge under § 319 "when the police officer takes a person into custody, or exerts some legal or physical restraint on his or her liberty." *Nelson*, ¶ 28.

¶24 The cases relied upon by Gonzales do not assist her argument that she is entitled to application of *Nelson*'s fourth exception to the public duty doctrine because they are each distinguishable. In *Lopez*, the convict who injured the plaintiff was under the express authority and control of the Pre-Release Center that failed to track his whereabouts after he walked away. In *LaTray* the officers had actual physical custody of the third party who harmed the plaintiff, and that party was assisting the officers in removing a prisoner from a police car at the time of the assault. In *Prindle* a court order required the county to take custody of and incarcerate a convicted individual who was turned away by jailers when he tried to surrender to serve time. That individual harmed the plaintiff during the time he should have been in jail.

¶25    It is clear under the facts of this case that the defendants never had custody or control of Menjivar until he came out of the Town Pump and was placed under arrest. Furthermore, it is only speculation that responding officers could have reasonably and safely arrested Menjivar before he raped Gonzales, an incident that occurred only minutes after the initial arrival of officers at the scene. Because of the quick and accurate investigative work done by the dispatchers, the initial responding officers arrived at the store about six minutes after Menjivar entered. The store was dark inside and the door was not locked. They did not know who was inside or how many people were involved. They had no information about the weapons involved and had no way to determine in that time what reaction they would provoke by confronting those inside or forcibly entering the building. Contrary to Gonzales' assertion in her brief, the officers did not watch and listen while she was raped. The officers' perimeter around the building was not custody or control of either Menjivar or Gonzales, but was only a step in attempting to assert custody or control of those inside the Town Pump. A hostage or captive like Gonzales is not in the control of responding officers, but of the criminal holding her. *Kepner v. Houstoun*, 164 F. Supp. 2d 494, 500 (E.D. Pa. 2001).

¶26    Therefore, we conclude as a matter of law that the responding officers did not have custody or control of either Gonzales or Menjivar at the time the rape occurred. They did not have custody or control of Menjivar until he came out of the store and officers placed him under arrest.

¶27    Gonzales also argues, briefly, that other *Nelson* special relationship exceptions to the public duty doctrine should be applied. She argues that the defendants undertook

11

specific action to protect her by responding to the Town Pump. The officers responding to the situation at the Town Pump were there to intervene in a possible robbery. Their identification of Gonzales as a victim and their understanding of her relationship to the events did not come about until she came out of the building and her role and identity were established. While dispatchers had determined that the initial cell phone call to 911 was placed from a number registered to Gonzales, they could not confirm that Gonzales herself was using the phone or that she had placed the call.

¶28 In *Eves* this Court found that undertaking efforts to find an identified missing person did not support a special relationship exception to the public duty doctrine. In *Kepner* the Court expressed the principle that law enforcement officers have no duty to rescue based upon knowing about a person's situation or even expressing intent to help. *Kepner*, 164 F. Supp. 2d at 498. In *Nelson* a duty arose because the officers personally dealt with the decedent and undertook affirmative steps to keep her from driving her vehicle because they believed that she was too intoxicated to do so safely. By contrast, the officers here were in no position to undertake specific actions to protect Gonzales until she came out of the store and her identity and role in the events were established. The facts here do not support application of the *Nelson* exception to the public duty doctrine that applies when officers undertake specific action to protect a person.

¶29 Gonzales also argues that she was reasonably induced to detrimentally rely on law enforcement officers. The facts adduced in the District Court do not support her argument. Gonzales did not know whether her attempt to call 911 had been successful and did not know that law enforcement officers had been dispatched to the store. She did

12

not know that law enforcement officers had a perimeter around the store. The only action she could possibly have taken in reliance upon actions of the officers was to eventually come out of the store. After Menjivar's arrest, she clearly had to leave the store so that officers could secure the crime scene and so that she could get medical attention. The officers were preparing to send a police dog into the store to subdue anyone else inside, and she had no alternative but to come out. This does not constitute detrimental reliance.

¶30 *Issue Two: Whether Gonzales was unlawfully arrested.* Gonzales' second claim is that the officers wrongfully arrested her when she left the building. The evidence adduced in the proceedings in District Court showed that after Menjivar left the store and was arrested, officers still did not know how many people were left inside or their connection to Menjivar and the robbery. The officers gave commands for anyone inside to come out and after some delay, Gonzales did so. She was directed to lie on the ground and was then handcuffed. After the approximately 30 seconds required to confirm her identity and involvement, she was taken to the hospital.

¶31 This event was at most a justified investigatory stop reasonably related to the officers' overall response to the robbery at the Town Pump. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S. Ct. 1568, 1574 (1985); *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879 (1968). Even outside the context of responding to a felony in progress, police are allowed to conduct a brief investigatory stop as long as they have a reasonable suspicion that justifies their actions. This is less than probable cause and requires only a minimal level of objective justification. *Gallegos v. City of Los Angeles*, 308 F.3d 987,

990 (9th Cir. 2002). The Fourth Amendment "accepts the risk" that officers may stop innocent people. *Gallegos*, 308 F.3d at 992.

¶32 In Montana law, this appears as a requirement for particularized suspicion that criminal activity is currently taking place. *State v. Tackitt*, 2003 MT 81, ¶ 24, 315 Mont. 59, 67 P.3d 295. The existence of particularized suspicion depends on the totality of the circumstances but does not require certainty on the part of the officer. *State v. Trombley*, 2005 MT 174, ¶ 9, 327 Mont. 507, 116 P.3d 771.

¶33 In this case the officers did not have to suspect that there was criminal activity taking place. Based upon the information given to them, they were reasonably certain that criminal activity was taking place. The officers responded to a call that there was a robbery in progress at a Town Pump store. They had information that there were two people in the store and that one of them was female, but did not know if there were others. When Menjivar came out and was arrested they did not know how many others were inside or the relationship between any others and Menjivar. Gonzales did not immediately show herself when officers ordered anyone in the building to come out. When Gonzales came out she was directed to lie on the ground, and was handcuffed and detained for what she estimated was only 30 seconds until her status could be determined. Officers were still giving commands directed at clearing the store and were trying to secure the building when Officer Anderson took Gonzales to the hospital for medical care. We decline to adopt a rule that would require officers in a similar situation to assume that anyone else at the scene of a crime is a victim or otherwise not involved in criminal activity after an initial arrest is made. Under the circumstances presented in this

14

case, the officers responded to Gonzales quickly and professionally and immediately got her to a safe position and to medical care.

¶34    Law enforcement officers are not required to compromise their safety or the safety of others by making potentially unwarranted assumptions as to the identity, involvement or dangerousness of persons at a crime scene.  As the District Court noted in this case:

> Assumptions get officers and victims killed.  It would have been unreasonable for the officers to assume that the plaintiff was the victim without some verification, and they were correct to treat everyone who exited the building as a possible perpetrator.

Officers are justified in diligently pursuing a means of investigation that will confirm or dispel suspicions as expeditiously as the situation allows.  In doing so, they may be required to detain and identify a person who is later confirmed to be a victim and not a perpetrator.  Officers who do so, however, have not committed any wrong.  *Sharpe*, 470 U.S. at 686-87, 105 S. Ct. at 1575-76.  Courts have upheld much longer handcuffed investigatory detentions of persons who were later determined to not be perpetrators. *Gallegos*, 308 F.3d at 992-93; *Haynie v. County of Los Angeles*, 339 F.3d 1071, 1077 (9th Cir. 2003).

¶35    Under the circumstances of this case, the brief detention of Gonzales was justified and provides her with no cause of action against the defendants.

¶36    The District Court orders granting summary judgment to the defendants are affirmed.

/S/ MIKE McGRATH

15

We concur:

/S/ JOHN WARNER

/S/ BRIAN MORRIS

/S/ JIM RICE

Justice W. William Leaphart, concurring in part and dissenting in part.

¶37 I concur with the resolution of issue one and dissent as to issue two: whether Leah Gonzales was unlawfully arrested.

¶38 As the court notes, police are allowed to conduct a brief investigatory stop as long as they have a particularized suspicion that criminal activity is currently taking place and that the person in question is or has been engaged in wrongdoing. *State v. Tackitt*, 2003 MT 81, ¶ 24, 315 Mont. 59, 67 P.3d 295; § 46-5-401(1), MCA. Whether particularized suspicion exists is a question of fact. *State v. Deines*, 2009 MT 179, ¶ 8, 351 Mont. 1, 208 P.3d 857. In light of the totality of circumstances set forth below, I submit that the ultimate question of fact (was there particularized suspicion) is in dispute and must be resolved by a jury:

¶39 1. Leah Gonzales (Leah) dialed 911 on her cell phone after the defendant entered the store.

¶40     2.  Upon receiving the 911 call, the dispatchers knew that there was a robbery in progress.

¶41     3.  The dispatchers were able to determine that the call came from Leah's cell phone.

¶42     4.  The dispatchers were able to determine that Leah's last known place of employment was a Town Pump.

¶43     5.  Police officers responded to the Town Pump where they arrested the defendant as he exited.

¶44     6.  In response to the officers' commands, Leah came out of the Town Pump, bare-footed and wearing her Town Pump apron.

¶45     7.  Officer Anderson was able to identify Leah based upon a prior contact.

¶46     8.  Officer Anderson also knew that Leah was pregnant and suspected that Leah was the store clerk.

¶47     Given the above totality of circumstances, a very strong argument can be made that there was no basis for conducting an investigatory stop of Leah.  That is, there was no basis for concluding that Leah was or had been engaged in wrongdoing.  Section 46-5-401(1), MCA.  At the very least, looking at the totality of the circumstances, there is a question of fact as to whether there was particularized suspicion justifying having Leah lie on the ground and be hand-cuffed.

¶48     The District Court erred in concluding as a matter of law that there was no question of fact as to the existence of particularized suspicion.  I would reverse the grant of summary judgment on issue two and allow the matter to be presented to a jury.

17

¶49 Finally, I confess that after reading Justice Nelson's dissent on the issue of the public duty doctrine, I thought that perhaps I had missed what Justice Nelson depicts as the main issue on appeal; whether the public duty doctrine should be thrown out as violative of Article II, sec. 18 of the Montana Constitution and § 2-9-102, MCA. Upon re-reading the briefs, however, I re-affirmed my recollection that, although the appellant argued that the *exceptions* to the public duty doctrine were triggered, there was no constitutional or statutory challenge to the doctrine itself. Nowhere in the five briefs on appeal is there any citation to Article II, sec.18 of the Montana Constitution or to § 2-9-102, MCA. None of the parties suggest that the Court should retain or reject the public duty doctrine. In other words, the viability of the public duty doctrine was not an issue in this case.

¶50 In my view, constitutional issues are best left to resolution after a party has raised a constitutional challenge and the issues have been briefed and argued. As Justice Nelson frequently points out when writing for the Court, we consistently refuse to address issues raised for the first time on appeal. *Matter of M.B.*, 350 Mont. 76, in *M.B.*, the appellants sought, for the first time on appeal, to raise "various constitutional issues" re the application of ICWA. For the Court, Justice Nelson stated: "We consistently refuse to consider theories or issues raised for the first time on appeal." *M.B.* at 80, n. 1; *Hajenga v. Schwein*, 336 Mont. 507, ¶ 21, 155 P.3d 1241 (it is unfair to fault the trial court for failing to rule on an issue it was never given an opportunity to consider); *In re A.S.*, 334 Mont. 280, ¶ 35, 146 P.3d 778; *In re Estate of Kindsfather*, 326 Mont. 192, 108 P.3d 487 (2005); *Bekkedahl v. McKittrick*, 312 Mont. 156, ¶ 31, 32 ("After examining the record in

18

this case, we conclude that the issue was not raised, briefed or argued in the district court. Therefore we decline to address it.") 58 P.3d 175 (2002); *State v. Shook*, 313 Mont. 347, ¶ 19, 67 P.3d 863 (2002); *Marriage of O'Moore*, 308 Mont. 258, ¶ 3, 42 P.3d 767; *State v. Knox*, 307 Mont. 1, ¶ 3, 36 P.3d 383 (2001); and *Renner v. Nemitz*, 306 Mont. 292, 297, 33 P.3d 255 (2001), in which Justice Nelson, for the Court, points out that exceptions to the above rule typically apply to criminal cases. The present case, of course, is not a criminal case.

¶51 If we are going to fault counsel and parties for belatedly attempting to raise issues which were not raised below or preserved for appeal, we should hold ourselves to the same standard and not offer gratuitous opinions on significant constitutional issues which neither the parties, the attorneys nor the lower court have addressed.

¶52 Our job is to resolve disputes which are brought before the Court, not to prejudge issues by rendering unsolicited opinions on constitutional matters without the benefit of any briefing or argument.

/S/ W. WILLIAM LEAPHART

Justice Patricia O. Cotter concurs and dissents.

¶53 I dissent from the Court's decision as to Issue Two, and in that regard join in ¶¶ 37-48 of Justice Leaphart's Concurrence and Dissent. As to Issue One, and the colloquy between Justice Leaphart and Justice Nelson concerning the viability of the Public Duty Doctrine, it is apparent that our jurisprudence with respect to resolving issues

19

not explicitly raised by the parties is not entirely consistent. For purposes of this case, I agree with Justice Nelson that the question of the Public Duty Doctrine's continuing viability is open to challenge in the proper case. I will reserve further judgment on this important constitutional issue until that case is before us and the issue is squarely presented and fully briefed. I therefore concur with the resolution of Issue One and dissent from our resolution of Issue Two.

/S/ PATRICIA O. COTTER

Justice James C. Nelson, dissenting.

¶54 This Court's public duty doctrine has claimed yet another innocent victim. Last time, it was Doris Nelson, a widow whose husband died as the result of medical care provided by an unqualified, unprofessional, and corrupt physician whom the State Board of Medical Examiners nevertheless licensed to practice medicine in this state. *See Doris Nelson v. State*, 2008 MT 336, 346 Mont. 206, 195 P.3d 293. This time, it is Leah Gonzales, a six-months-pregnant employee of a Bozeman Town Pump who was raped in the store's restroom on April 3, 2005, while local law enforcement officers, having responded to her 911 call, were standing by outside the store.

¶55 In *Doris Nelson*, this Court held that since the laws governing the regulation of the practice of medicine protect all the people of Montana, they do not, therefore, protect any of the people of Montana. *Doris Nelson*, ¶¶ 35, 49-50. Today, the Court holds that because the law enforcement officers who responded to Leah's 911 call owed a duty to

20

protect all the citizens of Bozeman and Gallatin County, they did not, therefore, owe this duty to any of the citizens of Bozeman and Gallatin County. Opinion, ¶ 20. That is because under this Court's public duty doctrine, " 'a duty owed to all is a duty owed to none.' " *Stephen Nelson v. Driscoll*, 1999 MT 193, ¶ 21, 295 Mont. 363, 983 P.2d 972. Plaintiff's counsel will be hard-pressed to explain this to Leah, who surely will wonder why it is that because the police owed a duty to her and all other Bozeman and Gallatin County citizens on the evening of April 3, 2005, they did not, therefore, owe this duty to her individually, with the result that her negligence claim fails at its inception.

¶56    I continue to reject this senseless judge-created doctrine as a violation of Article II, Section 18 of the Montana Constitution. *See Massee v. Thompson*, 2004 MT 121, ¶¶ 89, 93-95, 321 Mont. 210, 90 P.3d 394 (Nelson, J., specially concurring and dissenting); *Prosser v. Kennedy Enterprises*, 2008 MT 87, ¶¶ 71-75, 342 Mont. 209, 179 P.3d 1178 (Nelson, J., dissenting). While I explained my reasoning in *Massee* and *Prosser*, I further develop those arguments below. But first, I explain that to the extent this Court insists on continuing to apply this juris-legislation, it should, at least, do so in accordance with its own court-made rules—here, the second "special relationship" exception to the public duty doctrine: " 'when a government agent undertakes specific action to protect a person or property.' " *Stephen Nelson*, ¶ 22.

### The "Undertake Specific Action" Exception

¶57    At the outset, I agree with Justice Leaphart's dissent as to Issue Two. There is a question of fact as to whether there was particularized suspicion justifying the officers having Leah lie on the ground and be handcuffed. Concurrence/Dissent, ¶¶ 38-47. The

21

majority, who hold to the contrary, have exceeded the scope of appellate review and have improperly usurped the role of the jury in deciding that there was, in fact, particularized suspicion for conducting an investigatory stop of Leah and that the officers' conduct was, in fact, reasonable.

¶58 But the same is just as true with respect to Issue One. **First,** there is no dispute that the Bozeman and Gallatin County officers learned through a 911 call that a robbery was in progress at the Town Pump. **Second,** there is no dispute that the officers undertook specific action to protect people and property by responding to the 911 call. Indeed, it belies all logic and common sense to suggest that the officers initially "disperse[d] throughout the City [to] check for suspicious activity" (as the City puts it) and then rushed to the Town Pump (arriving just minutes after Leah placed the call) for any other reason but "to protect a person or property." Even the City concedes this point, acknowledging that the police "may have undertaken specific actions to protect Gonzales, including responding to her 911 call regarding a possible robbery, establishing a perimeter around Town Pump, and contacting the Special Response Team." Likewise, the County acknowledges that "the 911 dispatchers and the law enforcement officers involved did undertake actions in responding to what they perceived was a robbery in progress." The County notes that the dispatchers made "extraordinary efforts" to locate the scene of the robbery and arranged to have law enforcement officers dispatched to the Town Pump. The County further observes that the officers then established a perimeter around the building and arranged for the implementation of the Special Response Team and a negotiator—all with the purpose of protecting people and property. **Third,** it is

22

reasonable to infer, as we must, that the officers recognized the 911 call may have been made by someone in need of help (such as the victim of the robbery) and that upon arriving at the scene, they made tactical decisions as to how to proceed in order to address this possibility. *See Debcon v. City of Glasgow*, 2001 MT 124, ¶ 21, 305 Mont. 391, 28 P.3d 478 ("Any inferences to be drawn from the factual record . . . must be resolved in favor of the party opposing summary judgment"—here, Leah). **Fourth,** there is no dispute that the officers arrived several minutes before Leah was raped. **Fifth,** there is no dispute that the officers were present outside the store while Leah was being raped inside. **Sixth,** and lastly, there is no dispute that the 911 dispatchers reported to the officers during the course of these events that a male at the other end of the line was "threatening" a female and that the female was "crying" and "very frightened."

¶59 Leah's claim is that the officers failed to use reasonable care in responding to her 911 call and the robbery—in particular, by not using reasonable care to protect innocent persons inside the store from being further injured by the perpetrator of the robbery. In short, she claims the officers breached a legal duty and that this breach of duty was a substantial factor in the injuries she suffered. *See Peterson v. Eichhorn*, 2008 MT 250, ¶ 23, 344 Mont. 540, 189 P.3d 615; *Busta v. Columbus Hosp.*, 276 Mont. 342, 371, 916 P.2d 122, 139-40 (1996); *see also e.g. Massee*, ¶ 48 ("[T]he Sheriff's negligence was a cause of Vickie's death if it was a substantial factor in bringing it about." (internal quotation marks omitted)). As we reaffirmed just last year, "[s]ince negligence actions ordinarily involve questions of fact, they are generally not susceptible to summary judgment." *Fisher v. Swift Transp. Co.*, 2008 MT 105, ¶ 12, 342 Mont. 335, 181 P.3d

23

601. The only exception is where, on the facts presented, reasonable minds could not differ. *See Poole v. Poole*, 2000 MT 117, ¶ 14, 299 Mont. 435, 1 P.3d 936; *see also e.g. Peterson*, ¶ 37. Here, however, reasonable minds certainly could—and, in fact, do—differ over the officers' actions.

¶60    In this connection, Leah's expert on police and security practices (whose affidavit Leah filed in the District Court) determined as follows:

> Both the Bozeman Police officers and Gallatin Sheriff's officers acted with reckless disregard to a known risk of harm and deliberate indifference to Leah Gonzales' welfare by failing to act on a *crime in progress*. This incident *was not* and *never became* a hostage incident or issue. Officers, specifically Greg Megargel, officer in charge of the scene, recklessly failed to quickly identify to the robber and rapist, [Menjivar], that the police were on the scene and ready to intervene and stop his actions. To the contrary, they backed out of [sight]. Had they used all of the information known to them the best police practices would have been to immediately identify their presence, secure the perimeter and intercept his actions against Leah Gonzales.
>
> The information known to the police officers on the scene by their own observation included knowledge of the doors being unlocked and that there were two subjects in the store one of them obviously Leah Gonzales. She not only was known to work there, but officers on the scene knew her, and it was her cell phone that initiated the call and open line to the police. The open door meant unfettered access by the police to enter and intervene at will, which they chose not to do—a reckless and improper choice that violates best police practices. As time went on the police clearly had the opportunity to make a stealth entrance when Ms. Leah Gonzales was forced into the bathroom—an action the police clearly were aware of. Instead of a stealth entrance, the police simply remained stealth themselves while [Menjivar] was unfettered in his criminal actions against Leah Gonzales.

¶61    Nevertheless, a majority of this Court—evidently sitting as a quasi-jury—has decided as a factual matter that "the officers here were in no position to undertake specific actions to protect [Leah] until she came out of the store and her identity and role

24

in the events were established."  Opinion, ¶ 28.  This assertion founders on four factors.  **First,** as just noted, the City and the County themselves acknowledge that the officers undertook specific action to protect a person or property by ascertaining the origin of the 911 call and the events transpiring at the other end of the line and responding en masse, and in multi-agency force, to the location of the crime.  **Second,** the County states that the officers' actions with respect to Leah in fact did *not* depend on knowing her identity and role in the events.  The County explains in its brief that "even had law enforcement been made aware that Leah Gonzales was inside the building, it would not 'have altered, in any manner' their response at the scene."  **Third,** the majority's "finding" is not by any means established on the record before us—in fact, it is directly contradicted by Leah's expert—and it is not this Court's role to weigh and resolve conflicts in the evidence, to judge the credibility of witnesses, and to find the facts.  That, rather, is uniquely the task of a jury.  *Sandman v. Farmers Ins. Exchange*, 1998 MT 286, ¶ 45, 291 Mont. 456, 969 P.2d 277.  **Fourth,** the reasonableness of the officers' actions also is a question of fact, *see In re Marriage of Bryant*, 276 Mont. 317, 323, 916 P.2d 115, 119 (1996), and, as such, must be resolved by a jury, *Sandman*, ¶ 45.

¶62    The Court relies on *Kepner v. Houstoun*, 164 F. Supp. 2d 494 (E.D. Pa. 2001), and *Eves v. Anaconda-Deer Lodge County*, 2005 MT 157, 327 Mont. 437, 114 P.3d 1037.  *See* Opinion, ¶ 28.  But these cases are readily distinguishable from the present case and thus lend no support to the Court's decision here.  *Kepner* arose out of a hostage situation at a Pennsylvania state hospital.  The plaintiffs sued under 42 U.S.C. § 1983, alleging that state officials had violated their due process rights under the Fourteenth Amendment.

25

*Kepner*, 164 F. Supp. 2d at 496-97. In the portion of the *Kepner* opinion cited by the Court, the federal district court discussed the "state-created danger" rule and duties which arise under the Due Process Clause as the result of special relationships between state agents and citizens. *Kepner*, 164 F. Supp. 2d at 498. The court ultimately determined that the plaintiffs had no cause of action under substantive due process principles. *See Kepner*, 164 F. Supp. 2d at 500-01. But the court did *not* in any way purport to state the law as it relates to the special relationship exception to the public duty doctrine. *Kepner* simply has nothing at all to do with the present case—factually, legally, or otherwise.

¶63 In *Eves*, Zachary (a voluntarily committed patient at the Montana State Hospital in Warm Springs) left the hospital grounds and walked into the countryside without telling anyone. The temperature that day was approximately 37 degrees, and there was snow on the ground. Once hospital staff discovered that Zachary had left, the nursing supervisor telephoned local law enforcement to report his disappearance. She asked if county police could locate him but did not ask for a search-and-rescue operation. Indeed, the dispatcher told the nursing supervisor that because Zachary was a voluntarily committed patient, the police had no legal basis to stop and detain him. Thereafter, county police officer Blume was notified of Zachary's disappearance, but he did not initiate a search. Instead, he "kept lookout for Zachary during his routine patrol of the general area where Zachary was believed to be." He did not see any signs of Zachary, who was found several weeks later in a field approximately six miles from the hospital. *See Eves*, ¶¶ 4-5.

¶64 To the extent Blume actually undertook to protect Zachary, he did so by passively keeping "lookout" for Zachary during his routine patrol of the general area. Here, by

contrast, officers from multiple agencies abandoned their "routine patrols" and undertook specific action. They responded to a 911 call arising out of a robbery at the Town Pump. They endeavored to ascertain who was inside and what was transpiring. When the 911 call through Leah's cell phone was dropped, they didn't pack up and leave; rather, they called the store's land line and reestablished contact. All of this was done in an effort to protect people and property. *Eves* does not stand for the Court's untenable proposition that when police officers respond to the scene of a robbery, they have no duty to use reasonable care regarding the protection and safety of victims inside. Obviously, they do have such a duty. Indeed, the police are in the business of rescue and prevention of injury to person and property. Accordingly, when these professionals involve themselves in an actual rescue, they are bound to do so in accordance with applicable standards of care and proper procedure. *See e.g. City of Kotzebue v. McLean*, 702 P.2d 1309, 1313-14 (Alaska 1985) (police officer who responded to a life-threatening phone call owed a duty of reasonable care to protect the plaintiff); *Hopkins v. State*, 702 P.2d 311, 319 (Kan. 1985) ("A law enforcement officer is obligated to use reasonable and ordinary care and diligence in the exercise of his duties, to use his best judgment, and to exercise that reasonable degree of learning, skill and experience which is ordinarily possessed by other law enforcement officers in the same or similar locations."); *Restatement (Second) of Torts* § 323 and cmt. a (1965) (one who undertakes to render services to another which he should recognize as necessary for the protection of the other's person is subject to liability to the other for physical harm resulting from his failure to exercise reasonable

27

care to perform or complete the undertaking). As Judge Keating pointed out in *Riss v. City of New York*, 240 N.E.2d 860 (N.Y. 1968):

> No one questions the proposition that the first duty of government is to assure its citizens the opportunity to live in personal security. . . . [I]f a stranger, who had absolutely no obligation to aid [the plaintiff], had offered her assistance, and thereafter [she was injured] as a result of the negligence of the volunteer, the courts would certainly require him to pay damages. Why then should the city, whose duties are imposed by law and include the prevention of crime and, consequently, extend far beyond that of the Good Samaritan, not be responsible? . . . It is not a distortion to summarize the essence of the city's case here in the following language: "Because we owe a duty to everybody, we owe it to nobody." Were it not for the fact that this position has been hallowed by much ancient and revered precedent, we would surely dismiss it as preposterous. To say that there is no duty is, of course, to start with the conclusion. The question is whether or not there should be liability for the negligent failure to provide adequate police protection.

*Riss*, 240 N.E.2d at 862 (Keating, J., dissenting) (citations and paragraph breaks omitted).

¶65 While acknowledging that the responding officers undertook specific actions to protect people and property, the City and the County attempt to avoid this exception to the public duty doctrine by arguing that it applies only if the "detrimental reliance" exception also applies. *See Stephen Nelson*, ¶ 22 ("An exception to the public duty doctrine arises when there exists a special relationship between the police officer and an individual," and " '[a] special relationship can be established . . . (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; . . . .' "). In other words, they assert that we must "combine" these two exceptions into one. The City and the County then argue that Leah did not rely to her detriment on the officers' actions because she did not know for sure that the call to 911 actually went through and

28

that the police actually responded. This approach, however, lacks any support in our caselaw and is properly (albeit, implicitly) rejected by the Court. *See* Opinion, ¶¶ 27-29; *see also Doris Nelson*, ¶ 36 ("A special relationship can be established in *one of four* ways . . . ." (emphasis added)). The "detrimental reliance" exception is distinct from the "undertake specific action" exception.

¶66    Not only that, the approach argued by the City and the County belies common sense and, more importantly, what every person is taught by their parents and, indeed, by the police themselves. When Leah covertly and blindly (as was necessary under the circumstances) pushed the "9-1-1" buttons on her cell phone, she took a substantial risk of being further injured by her attacker should he discover her maneuver. In fact, he threatened to kill her if she called the police. But she desperately needed help, and she did the one thing that every person does in dire circumstances: she tried to call 911, she tried to send out the ordinary citizen's SOS, the average person's mayday. *See e.g.* Jeffrey D. Hickman, Note, *It's Time to Call 911 for Government Immunity*, 43 Case W. Res. L. Rev. 1067, 1067 (1993) ("In our modern society we are trained, almost from birth, that we should telephone 911 to summon help in the event of a medical emergency. Generally, when one calls 911, prompt help arrives quickly, and professional assistance is rendered, resulting in countless saved lives." (footnotes omitted)); *State v. Williams*, 623 N.W.2d 106, ¶¶ 84-89 (Wis. 2001) (Prosser, J., concurring) (explaining that "there is widespread public understanding of the 911 system" and that "[i]t is a system that citizens expect to depend upon in their own emergencies"). While Leah no doubt *hoped* that she had pushed the right buttons, she *knew* that if she had, rescuers would undertake

to protect and rescue her, and she *expected* that they would use reasonable care in responding to her call for help—just as a person in medical need whose service dog dials "9-1-1" expects that if the call goes through, responders will be promptly dispatched and will exercise reasonable care in addressing the situation.[1]  It is absurd to hold that although responding medical personnel owe a duty to the patient in the latter situation, the responding officers owed no duty to Leah here.  *Cf. Cummins v. Lewis County*, 133 P.3d 458, ¶ 64 (Wash. 2006) (Chambers, C. Johnson, & Sanders, JJ., concurring) ("A government entity that encourages people to call it for medical emergencies should be liable for the foreseeable consequences proximately caused by its failure to exercise ordinary care.").

¶67    Leah followed the rule that every one of us is taught from childhood:  When in trouble and in need of assistance, call (or, at least, try to call) the police or the fire department; call 911!  She did as she was taught, and she relied on the police—indeed, *counted* on them—to rescue her. That was the only reason why, at risk to her own safety, she dialed 911.  Her subjective expectation that officers would undertake to protect her is not a function of her objective knowledge that her plea for help was actually heard by them.  The point is that she relied on the police, if her call did make it through, to rescue her and use reasonable care in doing so.  The same would be true if she had pressed an alarm button.  While she might not know with certainty that the police had received the alarm, she would expect that if they had, they would exercise reasonable care when

---

[1] *See    e.g.*    Mia    Carter,    *Dog    Dials    911    to    Save    Owner*, http://pet-training.suite101.com/article.cfm/dog_dials_911_to_save_owner    (Sep.    15, 2008).

30

responding. As it turns out, Leah's 911 call did make it through and the police did undertake to protect her. The real question at issue in this case—a question for the jury— is whether the officers used reasonable care in doing so.

¶68 For the foregoing reasons, I conclude that the officers undertook specific action to protect people and property at the Town Pump; that the second special relationship exception to the public duty doctrine therefore applies; and that genuine issues of material fact exist as to whether the officers acted with reasonable care, thus precluding summary judgment. M. R. Civ. P. 56(c).

### The Public Duty Doctrine Generally

¶69 The "undertake specific action" exception aside, I disagree with the Court's decision on a more fundamental level—namely, its perpetuation of the public duty doctrine itself. As noted, this antiquated judge-created doctrine, which effectively immunizes governmental entities and their employees from liability for their tortious conduct, is incompatible with Article II, Section 18 of the Montana Constitution, which states that "[t]he state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature." *See Prosser*, ¶¶ 71-75 (Nelson, J., dissenting); *Massee*, ¶¶ 79-89, 93-95 (Nelson, J., specially concurring and dissenting). Not only that, the doctrine is incompatible with § 2-9-102, MCA, which states that "[e]very governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties whether arising out of a governmental or proprietary function except as specifically provided *by*

31

*the legislature*" (emphasis added). It is inappropriate for this Court, by judicial fiat, to effectively immunize governmental entities for their torts and those of their employees when the Constitution and the Legislature have expressly stated that such immunity does not exist except as specifically provided *by the Legislature*.

¶70 Notably, many other courts, as well as other members of this Court, have likewise recognized that the public duty doctrine cannot survive the abrogation of governmental immunity. *See e.g. Massee*, ¶ 98 (Regnier & Cotter, JJ., specially concurring) ("I agree with most of Justice Nelson's analysis and conclusion that it is difficult to sustain the Public Duty Doctrine in light of Article II, Section 18, of the Montana Constitution which abolished sovereign immunity in this state."); *Adams v. State*, 555 P.2d 235, 241-42 (Alaska 1976) ("[T]he 'duty to all, duty to no-one' doctrine is in reality a form of sovereign immunity, which is a matter dealt with by statute in Alaska, and not to be amplified by court-created doctrine. . . . Where there is no immunity, the state is to be treated like a private litigant. To allow the public duty doctrine to disturb this equality would create immunity where the legislature has not."); *Martinez v. City of Lakewood*, 655 P.2d 1388, 1390 (Colo. App. 1982) ("The concept of a public duty cannot stand . . . with the enactment of the statute abrogating sovereign immunity."); *Leake v. Cain*, 720 P.2d 152, 160 (Colo. 1986) ("[W]hether or not the public duty rule is a function of sovereign immunity, the effect of the rule is identical to that of sovereign immunity. Under both doctrines, the existence of liability depends entirely upon the public status of the defendant. The doctrine of sovereign immunity [has been abrogated, and n]othing in the provisions of the statutes dealing with governmental immunity leads us to conclude

32

that the General Assembly intended to reintroduce a concept so closely related to absolute sovereign immunity." (citation omitted)); *Commercial Carrier v. Indian River County*, 371 So. 2d 1010, 1015 (Fla. 1979) ("[The public duty] doctrine is a function of municipal sovereign immunity and not a traditional negligence concept which has meaning apart from the governmental setting. Accordingly, its efficacy is dependent on the continuing vitality of the doctrine of sovereign immunity."); *Beaudrie v. Henderson*, 631 N.W.2d 308, 314 (Mich. 2001) (The notion that "where there is a duty to all, there is a duty to none" is "tantamount to a grant of common-law governmental immunity, an area already dealt with by statute in many jurisdictions."); *Doucette v. Town of Bristol*, 635 A.2d 1387, 1390 (N.H. 1993) ("The protection provided by the public duty rule has been described as 'a limitation on liability' and as rendering a municipality 'immune from liability.' Consequently, we hold that the public duty rule impermissibly conflicts with the abrogation of common law municipal immunity in this State, and, therefore, will no longer be a recognized defense against claims of municipal negligence." (citation omitted)); *Schear v. Board of County Commrs.*, 687 P.2d 728, 731 (N.M. 1984) ("[T]he 'public duty-special duty' rule has no viability outside the context of sovereign immunity."); *Ficek v. Morken*, 685 N.W.2d 98, ¶¶ 28, 31 (N.D. 2004) (concluding that the public duty doctrine is "incompatible" with a statute which provides that political subdivisions are liable for damages caused by an employee's negligence under circumstances where the employee would be personally liable); *Hudson v. Town of East Montpelier*, 638 A.2d 561, 566 (Vt. 1993) ("[A]lthough the [public duty] doctrine is couched in terms of duty rather than liability, in effect, it resurrects the governmental

33

immunities that have been abrogated or limited by most jurisdictions over the last thirty-five years."); *Cummins*, 133 P.3d 458, ¶ 35 (Chambers, C. Johnson, & Sanders, JJ., concurring) ("The modern public duty doctrine ignores Washington's legislative waiver of sovereign immunity by creating a backdoor version of government immunity unintended by the legislature."); *Coffey v. City of Milwaukee*, 247 N.W.2d 132, 139 (Wis. 1976) ("The 'public duty'-'special duty' distinction . . . set[s] up just the type of artificial distinction between 'proprietary' and 'governmental' functions which this court sought to dispose of in [abrogating the doctrine of governmental immunity]. Any duty owed to the public generally is a duty owed to individual members of the public."); *Natrona County v. Blake*, 81 P.3d 948, ¶ 12 (Wyo. 2003) (" 'The public-duty/special-duty rule was in essence a form of sovereign immunity and viable when sovereign immunity was the rule. The legislature has abolished sovereign immunity in this area. The public duty only rule, if it ever was recognized in Wyoming, is no longer viable.' "); *see also* Eugene McQuillin, *The Law of Municipal Corporations* vol. 18, § 53.04.25, 197-98 (3d ed., West 2003) ("The public duty rule is not technically grounded in government immunity, though it achieves much the same results.").

¶71　　Again, the Legislature has decided that "[e]very governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties . . . except as specifically provided by the legislature." Section 2-9-102, MCA. Such liability attaches "under circumstances where the governmental entity, if a private person, would be liable to the claimant for the damages under the laws of the state." Section 2-9-101(1), MCA. While the Legislature has provided for certain

exceptions under which immunity is retained, *see generally* Title 2, chapter 9, part 1, MCA, the public duty doctrine is not one of the exceptions.

¶72    Under similar circumstances, the Ohio Supreme Court aptly observed that "[i]t is spurious logic to conclude that a doctrine that is, by definition, available only to *public* defendants can be consistent with a statute [waiving governmental immunity and] mandating that suits be determined in accordance with rules of law applicable to *private* parties." *Wallace v. Ohio Dept. of Commerce*, 773 N.E.2d 1018, ¶ 26 (Ohio 2002).  The court concluded that

> no matter what considerations of policy support the *judicial* application of the public-duty rule, we must remember that R.C. Chapter 2743 has *legislatively* set forth the public policy of this state.  That policy, expressed in R.C. 2743.02(A)(1), is to allow suits against the state according to the same rules as between private parties, "except that the determination of liability is subject to the *limitations set forth in this chapter*."  (Emphasis added.)  As we have stated previously, the public-duty rule is neither "set forth" in R.C. Chapter 2743 nor a rule of law applicable to suits between private parties.  It is inappropriate for the court to engraft the public-duty rule as an additional limitation on liability that the General Assembly has not provided.  If the public-duty rule is to become a rule of substantive law applicable to suits in the Court of Claims, it is the General Assembly—the ultimate arbiter of public policy—that should make it so by way of legislation.  It is not this court's role to apply a judicially created doctrine when faced with statutory language that cuts *against* its applicability.

*Wallace*, 773 N.E.2d 1018, ¶ 33 (footnote omitted); *accord Brennen v. City of Eugene*, 591 P.2d 719, 725 (Or. 1979) ("In abolishing governmental tort immunity, the Legislature specifically provided for certain exceptions under which immunity would be retained, and we find no warrant for judicially engrafting an additional exception [such as the public duty doctrine] onto the statute." (citation omitted)).  Similarly, the Missouri Supreme Court announced last year:

35

In deference to the statutory waiver of sovereign immunity provided by section 537.600.1, this Court is no longer willing to apply the judicially-created protections of the public duty doctrine in a way that would insulate government entities from tort liability where the legislature has expressly abolished such immunity. Application of the public duty doctrine should not expand the scope of a sovereign's immunity beyond that intended by statute, nor be contrary to the legislature's intent.

*Southers v. City of Farmington*, 263 S.W.3d 603, 613 (Mo. 2008) (citations and footnote omitted).

¶73 Yet, this Court inexplicably persists in applying its public duty doctrine—and at an ever-increasing rate, no less. The Court has never articulated a meritorious basis for doing so in the face of constitutional and statutory provisions to the contrary. In *Doris Nelson*, ¶ 35, the majority simply asserted that "[t]he rationale underlying this doctrine is that 'a duty owed to all is a duty owed to none' "—though one has to wonder how this logical absurdity constitutes a "rationale" for the doctrine. In *Stephen Nelson*, ¶ 21, the Court asserted that the doctrine " 'serves the important purpose of preventing excessive court intervention into the governmental process by protecting the exercise of law enforcement discretion.' " *Stephen Nelson*, ¶ 21 (quoting *Ezell v. Cockrell*, 902 S.W.2d 394, 400-01 (Tenn. 1995)). And in *Prosser*, ¶ 18, the majority opined that without the public duty doctrine, municipalities would be hopelessly mired in civil lawsuits and unduly constrained in their discretion to use limited resources to promote the general welfare.

¶74 Preventing unreasonable interference with the governing process and protecting against excessive governmental liability are two commonly cited justifications for retaining the public duty doctrine. *See Leake*, 720 P.2d at 158; *Beaudrie*, 631 N.W.2d at

36

313. As noted, however, the Legislature is the ultimate arbiter of public policy, and the Legislature has already decided that "[e]very governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties . . . except as specifically provided *by the legislature*." Section 2-9-102, MCA (emphasis added). The Legislature did not grant this Court the option of devising its own exceptions to the general tort liability placed on governmental entities by § 2-9-102, MCA, which is reason enough for this Court to refrain from applying its public duty doctrine.

¶75 But to the extent the Court is adhering to the public duty doctrine based on the policy concerns noted above, those concerns simply cannot survive close examination. In this connection, " 'the trend has been to abolish the [public duty] rule.' " *Ficek*, 685 N.W.2d 98, ¶ 20 (citing cases and secondary authorities). As summarized in *Ficek*, ¶¶ 21-26, and McQuillin, *The Law of Municipal Corporations* § 53.04.25, 206-08, courts have abrogated or refused to adopt the public duty doctrine for various reasons:

> 1. The doctrine is in effect, if not in theory, a continuation of the abolished governmental immunity doctrine.
>
> 2. The doctrine has a harsh effect on plaintiffs who would be entitled to recover for their injuries but for the public status of the tortfeasor, and there has been a reasoned reluctance to apply a doctrine that results in a duty to none where there is a duty to all.
>
> 3. The doctrine creates confusion in the law and produces uneven and inequitable results in practice. *See e.g. Jean W. v. Commonwealth*, 610 N.E.2d 305, 313 (Mass. 1993) (noting that courts " 'have not managed to draw an intellectually defensible line between immune "public" duties and actionable negligence' "); *Beaudrie*, 631 N.W.2d at 314 ("[A]ny attempt to draw a distinction between a government employee's 'public duty' and 'private duty' has proven to be confusing and prone to arbitrary and inconsistent application.").

4. Concerns over excessive liability are overstated. For one thing, the public duty doctrine is not the only protection municipalities have against massive liabilities. *See e.g.* § 2-9-108(1), MCA (limiting liability for damages suffered as a result of an act or omission of a government officer, agent, or employee). Moreover, the underlying purposes of the doctrine are better served by the application of conventional tort principles and the protection afforded by statutes governing sovereign immunity. *Leake*, 720 P.2d at 158; *see also City of Kotzebue*, 702 P.2d at 1314-15 (applying factors for determining whether city owed an actionable duty to the plaintiff); *Ryan v. State*, 656 P.2d 597, 598 (Ariz. 1982) ("We are also told that not only will the public treasury suffer but government will come to a standstill because its agents will be afraid to act. We can't but recall the dire predictions attendant to the publication of [our decision in *Stone v. Arizona Highway Commn.*, 381 P.2d 107 (Ariz. 1963), abolishing governmental immunity]. Arizona survived!"); *Beaudrie*, 631 N.W.2d at 315 ("[A] traditional common-law duty analysis provides a far more familiar and workable framework for determining whether a public employee owes a tort-enforceable duty in a given case."); *Schear*, 687 P.2d at 733-34 ("The spectre of dire financial consequences to municipalities raised by some courts . . . is no more real in the context of law enforcement officers' liability for negligence than it has proved to be in any other area in which sovereign immunity has been abolished. . . . [W]e are confident that any amounts associated with programs aimed at reducing law enforcement officers' negligence, or awarded to victims of negligent performance of duty, will be far outweighed by the advantage to society of more responsive agencies."); *Wallace*, 773 N.E.2d 1018, ¶ 38 ("[C]onventional negligence principles already provide some measure of protection against the possibility of the state's becoming the de facto guarantor of every injury somehow attributable to the actions of a state tortfeasor. A state defendant, just like any private defendant, remains protected by traditional tort concepts of duty, including foreseeability and pertinent public-policy considerations."); *Brennen*, 591 P.2d at 723 (noting that municipalities are protected from unlimited liability by statute and by principles of tort law); *Hudson*, 638 A.2d at 566 ("[C]oncerns over excessive government or public employee liability are baseless considering the limitations on liability afforded by conventional tort principles, various types of official immunity, or exceptions to waivers of sovereign immunity.").

5. The doctrine is incompatible with tort-claims acts mandating that suits against public defendants be determined in accordance with rules of law applicable to private persons. *See e.g.* § 2-9-101(1), MCA (directing that liability be analyzed as though the governmental entity were a private person); *Maple v. City of Omaha*, 384 N.W.2d 254, 260 (Neb. 1986) ("Nowhere [in the Political Subdivisions Tort Claims Act] is there found an exemption for the exercise of a duty owed to the

public generally."); *Schear*, 687 P.2d at 730 ("Nothing in the [Tort Claims Act] refers to performance of either public or special duties.").

6. The doctrine places the costs of inadequate government performance on the shoulders of the innocent victims of official negligence rather than spreading these costs throughout society, and it reduces the incentive for public bodies to see that the functions of government are carried out responsibly and with reasonable care. *Stewart v. Schmieder*, 386 So. 2d 1351, 1357 (La. 1980); *see also Cummins*, 133 P.3d 458, ¶ 64 (Chambers, C. Johnson, & Sanders, JJ., concurring) ("[G]overnment should be accountable for its actions just as a private party is held accountable. Accountability encourages competency."); Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* vol. 4, § 46.02[1][a], 46-9 (4th ed., 1996) ("[T]he doctrine has the effect of removing an incentive to ensure that the functions of government are responsibly executed.").

¶76 For these reasons, the dire consequences the Court fears if the public duty doctrine is not retained are simply not plausible; in fact, there are persuasive policy reasons to jettison the doctrine. But more importantly, *this Court's* policy concerns are no justification for ignoring unequivocal *constitutional and statutory directives*. Article II, Section 18 abolishes governmental immunity; the Legislature has provided that every governmental entity is subject to liability for its torts and those of its employees except as specifically provided *by the Legislature*, § 2-9-102, MCA; and the Legislature has not enacted the public duty doctrine. Consequently, each time this Court applies its public duty doctrine, it flouts the will of the people, as expressed through the Constitution and legislative enactment, that our government and its agents generally be held liable for their torts. As I have said before, the public duty doctrine should be consigned to the dustbin of history, where it clearly belongs. *Prosser*, ¶ 75 (Nelson, J., dissenting).

¶77 Before concluding, I note Justice Leaphart's contention that the viability of the public duty doctrine "was not an issue in this case." Concurrence/Dissent, ¶ 49. With

39

respect, I disagree.  The City, the County, Officer Anderson, and Officer Megargel have each asserted the public duty doctrine as a defense to Leah's negligence claims.  Leah, in turn, has disputed the doctrine's applicability.  As noted, the public duty doctrine shields governmental defendants from tort liability.  Yet, the doctrine is judge-created, and the Legislature has proclaimed that "[e]very governmental entity is subject to liability for its torts and those of its employees . . . except as specifically provided *by the legislature* under Article II, section 18."  Section 2-9-102, MCA (emphasis added).  These facts are all self-evident, and I maintain that it is not the province of this Court, in case after case, to shield governmental defendants from tort liability in the face of express constitutional and statutory directives to the contrary.  Whether or not Leah has made this point explicit in her appellate briefs is, in my view, not the issue.  It is axiomatic that we are bound to faithfully uphold the Constitution and apply the laws enacted by the Legislature.  *See e.g.* Mont. Const. art. III, § 3.  Moreover, as Justice Leaphart himself has previously pointed out, this Court is not required to blindly apply the law in conformance with the parties' underlying assumptions.  *See State v. Zabawa*, 279 Mont. 307, 319, 928 P.2d 151, 159 (1996) (Leaphart, Hunt, & Trieweiler, JJ., dissenting) (asserting that we are not bound by counsel's assumptions concerning constitutional provisions; rather, we have a duty to provide an independent interpretation); *see also Kudrna v. Comet Corp.*, 175 Mont. 29, 51, 572 P.2d 183, 195 (1977) ("If the court were limited to the arguments and reasoning of counsel in its decisions of cases, to the exclusion of its own observations, many cases would lead us far from what we understand to be the true object of the court." (internal quotation marks omitted)).

¶78    Indeed, I cannot agree with the proposition that we must consciously disregard express constitutional and statutory directives which bear directly on our resolution of a case simply because the parties misapprehended the relevance of those directives, chose to ignore them, or simply were unaware of them.  In fact, there is precedent for raising an applicable constitutional or statutory issue sua sponte.  Just last year, in a decision which Justice Leaphart joined, the Court observed that " 'a serious error which appears on the face of [the] record is reviewable, although not presented by the parties' if ignoring the error would cause substantial injustice."  *State v. Andersen-Conway*, 2007 MT 281, ¶ 14, 339 Mont. 439, 171 P.3d 678 (brackets in *Andersen-Conway*) (quoting *Kudrna*, 175 Mont. at 51, 572 P.2d at 195); *cf. Wolfe v. Dept. of Labor and Industry*, 255 Mont. 336, 339, 843 P.2d 338, 340 (1992) (this Court may consider an otherwise procedurally-barred question if it "relates to a substantial or fundamental right of a litigant"); *Cottrill v. Cottrill Sodding Service*, 229 Mont. 40, 42, 744 P.2d 895, 896 (1987) (this Court may consider an otherwise procedurally-barred constitutional issue if it " 'involve[s] broad public concerns' ").  Relying on this rule, the Court "sua sponte" raised and decided an issue that was "dispositive" of the appeal, notwithstanding the parties' failure to do so themselves, because ignoring the error would have caused substantial injustice.  *See Andersen-Conway*, ¶¶ 14-19.  Of course, this rule is not limited to criminal cases—indeed, it derived from a civil case (*Kudrna*)—and as applied to the facts here, I submit that applying the public duty doctrine to Leah's tort claims in the face of Article II, Section 18 and § 2-9-102, MCA, constitutes a serious error and will cause her substantial

injustice (she is being thrown out of court without even a trial), thus requiring our review of the doctrine's viability.

¶79 Lastly, I respectfully disagree with the suggestion that questioning the validity of the public duty doctrine involves "prejudging" an issue. Concurrence/Dissent, ¶ 52. We are long past the point of "prejudging" this issue. In point of fact, the Massees asked us to abolish the doctrine five years ago. *See Massee*, ¶ 44; *see also Prosser*, ¶¶ 70-71 (Nelson, J., dissenting) (noting the Neighbors' argument in the district court that the doctrine is unconstitutional). Moreover, Doris Nelson pointed out in the district court that the State's argument that it had no duty of care "is basically a sovereign immunity argument, which clearly doesn't apply under our constitution." Then, on appeal, she argued that governmental immunity exists in this state only to the extent the Legislature has enacted statutes providing for it and that it is "[t]he function of the legislature, not this Court, to establish the public policy of the State" vis-à-vis governmental liability and immunity for its torts. Yet, rather than remand the case for further proceedings on the question of whether the State owed Jack Nelson a duty, the Court instead invoked the public duty doctrine sua sponte—even though the parties had not briefed the doctrine and its exceptions on appeal, and even though the district court had declined to address the State's duty argument in the first instance when ruling on the cross-motions for summary judgment—in order to affirm the district court's decision that Doris could not sue the Board of Medical Examiners. *See Doris Nelson*, ¶ 34. Worse still, in its zeal to reach the desired result, the Court did not address three of the four exceptions to the doctrine—

42

most notably the question of whether Jack had relied to his detriment on the fact that the Board issued Dr. Stephenson a license to practice medicine. *See Doris Nelson*, ¶¶ 36-50.

¶80 The Court's approach in these and other public-duty cases could easily lead a person to conclude that the validity of the public duty doctrine is settled. Thus, it is not surprising that Leah has not made the specific arguments that Justice Leaphart contends are missing from her briefs in this appeal. In any event, setting aside our difference of opinion as to whether the viability of the public duty doctrine is an issue in this particular case, one thing is clear: The doctrine's underlying validity is, in fact, open to challenge in the proper case—presumably, a future case that directly challenges the public duty doctrine on constitutional grounds under Article II, Section 18, and statutory grounds under §§ 1-1-108, 2-9-101(1), and 2-9-102, MCA. *See Massee*, ¶¶ 79-95 (Nelson, J., specially concurring and dissenting); *Prosser*, ¶¶ 70-75 (Nelson, J., dissenting); *Doris Nelson*, ¶¶ 65-77 (Nelson, J., concurring in part and dissenting in part); ¶¶ 69-76, *supra*.

### Conclusion

¶81 In sum, I conclude that this Court's public duty doctrine is incompatible with Article II, Section 18 of the Montana Constitution and the liability/immunity provisions of Title 2, chapter 9, parts 1 to 3, MCA. There is little reason to believe that abolishing the doctrine would commence the parade of horribles the Court fears. But, in any event, the policy concerns cited by the Court do not justify the Court's perpetuation of the doctrine. It is for the Legislature to weigh the public policy arguments and enact appropriate measures to protect governmental entities and their employees, if necessary. The Legislature has done so and has decided that every governmental entity is subject to

liability for its torts and those of its employees acting within the scope of their employment or duties, except as specifically provided *by the Legislature*. It is not for this Court to create and perpetuate its own exceptions to § 2-9-102, MCA. As one court has noted, when a court applies the public duty doctrine in the face of statutory abrogation of sovereign immunity, " 'the judicial responsibility for governmental irresponsibility is very grave indeed.' " *Brennen*, 591 P.2d at 724 (quoting K. Davis, *Administrative Law Treatise* vol. 3, § 25.06, 458-59 (1958)).

¶82 Meanwhile, Leah will no doubt be dumbfounded by the Court's decision. During the course of a robbery, she managed surreptitiously to call 911. The call went through, the dispatchers ascertained what was occurring and where, and the police were sent to Leah's location. Upon arriving, they established a perimeter around the Town Pump, determined that the door was unlocked, and observed two individuals inside. They ascertained that one of the individuals (Menjivar) was directing the other individual (Leah). When the call from Leah's cell phone was dropped, the dispatchers established a connection on the store's land line. They told the officers that the male (Menjivar) was "threatening" the female (Leah) and that she was "crying" and "very frightened." The police saw Menjivar and Leah enter the restroom, where it turns out Leah was then raped. They arrested Menjivar when he left the store of his own volition. They then threatened Leah with a dog, at which point she exited the store, barefoot and wearing her Town Pump apron. They forced her to the ground and handcuffed her—although she was six months pregnant and one of the officers had recognized who she was.

44

¶83 Leah claims the officers acted negligently and unreasonably, but the Court holds that the officers owed her no duty to exercise reasonable care when they responded to her distress call. The Court explains that because the officers owed all members of the public a duty to protect and preserve the peace, they did not owe this duty to any members of the public. Opinion, ¶ 20. If Leah is confused by this, I, for one, do not blame her. Indeed, the Court's decision makes no sense. We have now ruled, as a matter of law, that when the police respond to a crime in progress, they have no duty to protect the victim of the crime because they have a duty to protect everybody. Thus, the victim is simultaneously entitled and not entitled to reasonable police protection. We have also ruled, as a matter of law, that regardless of expert evidence that the police breached the appropriate standard of care, they are nonetheless immune from liability for such breach.

¶84 Leah may be surprised to learn that had the events of April 3, 2005, transpired across the border in North Dakota or Wyoming, she would be entitled to pursue her negligence claims. *See Ficek*, 685 N.W.2d 98, ¶ 28; *Natrona County*, 81 P.3d 948, ¶ 12. She may find it bewildering that in Montana, "a duty owed to all is a duty owed to none," *Doris Nelson*, ¶ 35, but in some other states, "[a]ny duty owed to the public generally is a duty owed to individual members of the public," *Coffey*, 247 N.W.2d at 139. She may be frustrated and shocked to learn that she is barred from pursuing her negligence claims not because of any constitutional or statutory barrier to those claims, but because of a judge-created rule that actually contravenes the Montana Constitution and statutes enacted pursuant thereto. *See* Mont. Const. art. II, § 18; § 2-9-102, MCA. Finally, she may be surprised to find out that:

45

• Notwithstanding her own personal knowledge of what she felt at the time, this Court has decided that Leah in fact did not rely on the police to come to her rescue (even though they did) because she did not know that her call to 911 had actually gone through and that the police had actually been dispatched to the store. Opinion, ¶ 29.

• The responding officers did not undertake to protect her until she came out of the store—at which point they forced her to the ground and handcuffed her. Their purpose in responding to her 911 call, surrounding the store, and attempting to ascertain what was transpiring inside was, apparently, for some other purpose but not to protect a person or property. Opinion, ¶ 28.

• Being forced to the ground and handcuffed, although one of the officers recognized Leah, "was at most a justified investigatory stop." Opinion, ¶ 31.

• The officers were justified in forcing Leah to the ground and handcuffing her, Opinion, ¶ 34, but they did not owe her a duty of reasonable care or protection, Opinion, ¶¶ 20-29.

• Leah has been denied her fundamental right to her day in court under Article II, Section 16 of the Montana Constitution because of a judge-created rule that is outdated, logically absurd, and patently unconstitutional.

¶85 Whether the officers acted appropriately and with reasonable care when they responded to the Town Pump I cannot say. That is a question of fact for a jury of Leah's peers to decide. It is not a decision to be made by the District Court or this Court. Leah presented the District Court with sufficient evidence to withstand summary judgment. She is entitled to a trial on her complaint. That she has been thrown out of court and under the bus because of the public duty doctrine is unconscionable.

¶86 Montana's courts have no business shielding the government or its actors from their own negligence, misconduct, misfeasance, or malfeasance. That is the Legislature's job. Mont. Const. art. II, § 18; § 2-9-102, MCA. Montana's courts have no authority to enact their own tort-relief act by devising exceptions to the rule that "[e]very

46

governmental entity is subject to liability for its torts and those of its employees acting within the scope of their employment or duties . . . except as specifically provided by the legislature." Section 2-9-102, MCA. The public duty doctrine is simply indefensible from a constitutional standpoint, a statutory standpoint, and a commonsense standpoint.

¶87 I would reverse and remand for a trial. I dissent.

/S/ JAMES C. NELSON